**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas J. HAGGERTY, Defendant-
Appellant.**

**No. 16892.**

United States Court of Appeals
Seventh Circuit.

Dec. 3, 1969.

Rehearing Denied Feb. 13, 1970.

Edward J. Calihan, Jr., Chicago, Ill., for defendant-appellant.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, John L. Conlon, Asst. U. S. Attys., of counsel.

Before HASTINGS, Senior Circuit Judge, and SWYGERT and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Defendant Haggerty is the long time Secretary-Treasurer of the Milk Wagon Drivers Union [1] in Chicago. He was charged, in Count I, with embezzling $25,000 of union funds on July 24, 1962 [2] and, in Count II, with wilfully causing false entries on that date in union records which the law required to be kept. [3] The jury found him not guilty of Count I but guilty of Count II. He has appealed.

Both counts relate to a union check for $25,000, drawn on First National Bank, dated July 24, 1962, and payable to Drovers National Bank. The union bookkeeper, Thomas Heneghan, entered the check in the union cash disburse-

---

1. Local 753, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. 29 U.S.C. § 501(c).

3. 29 U.S.C. § 439(c).

ments journal on July 24 with the explanation, "Transfer of Fund". The union had a savings account at Drovers. Heneghan testified: "Mr. Haggerty told me to give him the pass book for the Drovers Bank, which I did, and a check was given to Mr. Haggerty. He told me to make the entry for the transfer of funds from the First National Bank to the Drovers National Bank in the amount of $25,000." Heneghan pointed out that the commercial account at First National yielded no interest, but the savings account would, and stated that a transfer of funds is just a transfer from one bank to the other.

Haggerty did not deposit the check in the savings account at Drovers. He applied it on a $100,000 note due Drovers from Bert Ferrell and guaranteed by Haggerty, Mr. Adamowski and two Trilla brothers.

For a period of months, Haggerty did not return the Drovers pass book to Heneghan and the canceled $25,000 check, paid by First National July 25, was not turned over to the other trustees of the union with the other canceled checks in the customary manner. The jury could properly infer that Haggerty wished to avoid examination of the transaction. On October 23, 1962 he deposited $25,000 in the union's savings account at Drovers. He raised the money from personal sources. This occurred after a Department of Labor subpoena had been served, requiring production of the union records.

Haggerty's defense to the embezzlement count was that in the light of the background of the $100,000 Ferrell transaction, the $25,000 check had been used for a union and not a personal purpose. The jury believed him, or at least had enough doubt to acquit him on that count.

The explanation for the $25,000 check entered in the cash disbursements journal was clearly wrong. It indicated that the check would not change the union's cash position, but would increase its account at Drovers by the same amount it decreased its account at First National. The issue on Count II was whether Mr. Haggerty had wilfully caused the entry.

He gave no testimony on this point on direct examination, but on cross-examination, testified as follows:

"Q. Did you see Mr. Heneghan on July 24, 1962, and request a check from him at that time?

"A. That is true.

"Q. What did you tell him about your purpose for that check at that time?

"A. I just asked him for the check. I don't tell him what is the purpose of the check. But he surmised that it was going to be for a deposit or some kind of an investment.

"Q. Did you tell him that you were even going to make a deposit of any kind?

"A. No. I don't have to tell him because he sees afterwards what is done with the investment.

"Q. So, you told Mr. Heneghan nothing as to what he should put into the books and records at that time?

"A. No, sir. I never tell him what he should ever put into the books and records."

On the critical point, this testimony conflicted with that of Heneghan, quoted earlier, and the jury evidently believed Heneghan.

The details of the transaction which brought about the $100,000 Ferrell loan are confusing, but since they relate more directly to Count I, as to which the jury found in favor of Haggerty, and are only background for Count II, they need only be outlined here.

In late 1961 Haggerty learned that a very valuable tract, owned by the Ahern family, could be purchased for $4,000,-000. This was considered a good buy and Haggerty thought it would be a profitable investment for the union. The Aherns were represented by attorney Gatenbey. On January 5, 1962, at

Gatenbey's office, Haggerty signed a contract purporting to be on behalf of the union and providing for the purchase by the union or its nominee. He tendered a $100,000 check as earnest money. This was a cashier's check of Amalgamated Trust & Savings Bank, payable to the Health and Welfare Fund of the union. Haggerty endorsed the check on behalf of the Fund.

The check was not honored because Haggerty had no authority to endorse a check payable to the Fund. Gatenbey asked for a replacement. Although Mr. Haggerty claimed that the check represented a loan by Amalgamated to him, to assist in the purchase by the union, and had been made payable to the Fund by mistake, Mr. Haggerty did not obtain a replacement check from Amalgamated. Adamowski and one of the Trillas had accompanied Haggerty at Gatenbey's office and there was testimony that Adamowski, Trilla, and another were to share in a commission, to be paid by the Aherns. They prevailed upon Ferrell to borrow $100,000 from the Drovers Bank on his note, guaranteed by Haggerty and the others. Ferrell wrote a check to Haggerty, the Drovers certified it, and it was given to Gatenbey as a substitute for the Amalgamated check.

Haggerty testified that he hoped to obtain a loan from the Central States Pension Fund in order to finance the purchase. The application for the loan was rejected in September, 1962.

There was evidence that Haggerty had discussed the proposed purchase to some extent with union members and the other officers or trustees of the union. There was some opposition, but Haggerty claimed that he acted in the belief that the union would take appropriate official action to authorize the purchase. Presumably the jury believed that. It is clear that no authorization had been given at the time the purchase contract was signed nor by July 24 nor at any time up to October 23 when Haggerty

raised $25,000 and put it in the union's savings account at Drovers.

Against the background just described, we shall consider the arguments raised on appeal.

1. *Delay in indictment.*

The matter was presented to the October, 1963 grand jury, but it took no action. The present indictment was returned in July, 1967. The trial was held in January, 1968. Two witnesses who testified before the grand jury in 1963 and three other individuals died before the indictment or before trial. Motions were made for dismissal because of the delay.

The five persons noted, who died between the date of the transaction and the date of trial, were two union officers, who testified before the grand jury in 1963, a union steward, a union officer who died in 1963, before the first presentation to the grand jury, and the officer of Amalgamated from whom Mr. Haggerty obtained the cashier's check which he first used as earnest money.

Giving full credit to representations made by Haggerty to the district court, it may be that some of these men could have testified in a manner to corroborate his claim that he expected that the union would make the purchase of the Ahern land and that his negotiation with Gatenbey and deposit of earnest money were undertaken in good faith as preliminaries to such purchase. Perhaps as to Count I, he made "a plausible claim of prejudice" [4] resulting from the unexplained and apparently unnecessary delay in indictment. But the jury disposed of any element of prejudice in that regard by acquitting him on Count I.

As to the false entry, the picture is different. The relevant facts are almost entirely undisputed. Haggerty admitted asking Heneghan for and receiving the check. Haggerty's actual use of the check for a purpose other than was shown in the entry is undisputed. The

4. United States v. Feinberg (2d Cir., 1967), 383 F.2d 60, 65.

use was not authorized. If Haggerty directed Heneghan to make the entry or if he led him to believe the check was to effect a deposit to the savings account, with the knowledge that Heneghan would record such purpose, Haggerty intentionally caused a false entry.

The narrow factual issue, disputed between Haggerty and Heneghan, is whether Haggerty told Heneghan to show the check as a transfer of funds. No one else was present. Haggerty does not claim to know, and does not even suggest, what knowledge the deceased witnesses may have had which would help to resolve the dispute. We have pointed out the inferences which could be drawn from his failure to return the pass book and from the fact that the canceled check was missing from the normal channel. The purchase contract and payment of earnest money had originally been handled in a way which would not be reflected on union records. Haggerty has made no claim that the deceased witnesses could explain away those facts.

We have examined the 1963 grand jury testimony of the two union officers, McNulty and Moline, and have found nothing helpful to Mr. Haggerty on Count II. Although the government informed the district court that it had no objection to an order "for the disclosure of the testimony of Gus Moline and William McNulty given on October 9, 1963", the district court did not order the disclosure and the transcript was transmitted to us under seal. We direct our clerk to permit counsel for Mr. Haggerty and Mr. Haggerty, if he desires, to examine the transcript of such testimony at some time before the time for petition for rehearing expires.

█ With respect to Count II, Haggerty has not shown he has been prejudiced by the delay, and the burden has not shifted to the government to show the delay was the result of a valid police purpose.[5]

### 2. *The relationship of the false entry to the statute allegedly violated.*

█ Defense counsel points out that the statute allegedly violated does not describe in detail the books and records which must be kept by a union subject to the statute. He argues therefrom that the statute is vague, that the indictment is vague, or that a false entry in this union's cash disbursements journal is not a violation of the statute. He recognizes that these contentions overlap.

The penalty provision, 29 U.S.C. § 439 (c), applies to false entries in books or records required to be kept by any provision of the subchapter. 29 U.S.C. § 436 requires persons required to file reports to maintain records on the matters required to be reported. 29 U.S.C. § 431(b) requires labor organizations such as the union in this case to file annual reports disclosing its financial conditions and operations. It is apparently the defense contention that when all these sections are read together they fail to reach a false explanation of a disbursement entered in a cash disbursement journal such as this union maintained. We disagree.

29 U.S.C. § 431(b) requires the annual report to contain "the following information in such detail, as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—* * * all in such categories as the Secretary may prescribe." The classes of information listed are assets and liabilities at the beginning and end of the year, all receipts and their sources, and all disbursements and their purposes. Classes of disbursements specifically listed, in addition to all "other disbursements", are salaries and other disbursements to each officer and to employees of a certain class, loans aggregating more than $250 to any officer, employee, or member, and loans to any business enterprise.

5. United States v. Deloney (7th Cir., 1968), 389 F.2d 324, 325.

29 U.S.C. § 436 provides:

"Every person required to file any report under this subchapter shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary may be verified, explained or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than five years after the filing of the documents based on the information which they contain."

29 U.S.C. § 439(c) provides:

"Any person who willfully makes a false entry in or willfully conceals, withholds, or destroys any books, records, reports, or statements required to be kept by any provision of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both."

§ 436 does not prescribe a particular form of bookkeeping system, but we think it clearly requires one which adequately records the information which must be reported at the close of the fiscal year. And whatever the actual form of such records, § 439(c) clearly makes it a punishable offense wilfully to make a false entry therein.

The entry in question indicated an increase in cash in one bank and a decrease in cash in another, with no net change in the union's cash position. The use of the $25,000 to make a payment of the Ferrell note has been found not to be an embezzlement. It must then have been either a loan to Haggerty or a reimbursement to him or Ferrell for part of the earnest money on the purchase of the Ahern tract. In either case the check was not used to transfer cash from one bank to another, and the disbursement should have been truthfully recorded so that it could eventually be reflected in the annual report and be available for verification of the report after it was filed.

In our view the statute was sufficiently definite in prescribing the records to be kept and imposing a penalty for a false entry therein, the statute applied to the false entry made in this case, and there was no deficiency in the indictment.

3. *Wilfulness.*

■ Defense counsel appears to contend that in order to find that Haggerty acted wilfully in causing a false entry, the jury must find that he intended to use the $25,000 for his own benefit and accordingly that the motivation for the false entry was to hide his embezzlement. As he points out the jury must have found, as to Count I, that Haggerty used the money with the expectation that the union would eventually authorize the purchase and reap the benefit. We conclude, however, in the light of the purpose of the statute, that a deliberate purpose to conceal, by an entry on the union records, the disbursement of union funds for a purpose not yet authorized by the union is sufficient for a finding of wilfulness. Making of such false entry is not rendered innocent by the expectation that the union will eventually ratify the disbursement and make further concealment unnecessary.

The provisions involved are part of the Labor-Management Reporting and Disclosure Act of 1959. Congress found, in part, that it is essential that officials of labor organizations adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations and that there had been failures to observe such standards, requiring legislation. (29 U.S.C. § 401.) Labor organizations were required to adopt and file constitutions and bylaws. (29 U.S.C. § 431.) § 501 (a) declared that the officers occupy positions of trust, and made it their duty, among others, to manage, invest,

and expend the money of the organization in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder. The annual reports of financial condition and operations, already referred to, were made public information by § 435. Each labor organization must make the information required to be contained in the report available to all of its members and the officers are given the duty to permit any member for just cause to examine any books, records, and accounts necessary to verify such report (§ 431(c)).

The report of the Senate Committee on Labor and Public Welfare on the bill which became the act stated:

"A union treasury should not be managed as the private property of union officers, *however well intentioned*, but as a fund governed by fiduciary standards appropriate to this type of organization." (Emphasis added.) [6]

4. *Exclusion of evidence.*

Defense counsel sought to show that at some date after October 23, 1962 the members of the union voted unanimously to buy the Ahern property, and voted to reimburse Haggerty for the $100,000 for which he had made himself liable. The district court excluded the proof. If this evidence was properly admissible for any purpose, it could be relevant only to Count I. This vote by the union membership could not change a false entry previously made into a correct one.

The district judge imposed the maximum sentence for Count II. Defendant has not claimed on appeal that in so doing the judge was giving weight to any view of the facts he may have had which was at war with the jury's finding on Count I.

The judgment is affirmed.

6. S.Rep.No. 187, 86th Cong.; 1st Sess. 8 (1959); 1959 U.S.Code Cong. & Adm.News p. 2324.