**UNITED STATES of America**

v.

**Michael BUDZANOSKI, Appellant in No. 71–2030, and John Seddon.**

**Appeal of John SEDDON, No. 71–2031.**

**Nos. 71–2030, 71–2031.**

United States Court of Appeals, Third Circuit.

Argued March 17, 1972.

Decided June 12, 1972.

---

Paul A. Simmons, Hormell, Tempest, Simmons, Bigi & Melenyzer, Monongahela, Pa., for appellant Michael Budzanoski.

Lloyd F. Engle, Jr., Kuhn, Engle & Blair, Melvin P. Stein, Pittsburgh, Pa., for appellant John Seddon.

Marshall Tamor Golding, Dept. of Justice, Crim. Div., Washington, D. C., Henry E. Petersen, Asst. Atty. Gen., Crim. Div., Thomas H. Henderson, Jr., Hays Gorey, Jr., Trial Attys., U. S. Dept. of Justice, Washington, D. C., for the United States.

Before MAX ROSENN and JAMES ROSEN, Circuit Judges, and VAN ARTSDALEN, District Judge.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

### I.   THE FACTS

Appellants Michael Budzanoski and John Seddon are President and Secretary-Treasurer, respectively, of District 5 of the United Mine Workers of America, located in Pittsburgh, Pennsylvania. They were convicted in a jury trial as indicted on four counts. Three of the counts charged them with violations of Section 209 of the Labor-Management Reporting and Disclosure Act of 1959 (also known as the Landrum-Griffin Act, and known hereinafter as the "LMRDA"), 29 U.S.C. § 439 (1970), by falsifying financial records their labor organization is required to keep under Sections 201 and 206 of the LMRDA, 29 U.S.C. §§ 431, 436 (1970). The fourth count charged them with conspiring between themselves and with others to cause false entries to be made on vouchers and monthly reports submitted to District 5 in violation of 18 U.S.C. § 371 (1970).[1]

At trial, the Government relied principally on the testimony of two unindicted co-conspirators, Pellegrini and Halvonik. Their combined testimony established

1.   The opinion of the district court denying appellants' motion to dismiss the indictment is reported at D.C., 322 F.Supp. 1064 (W.D.Pa.1971).

that on February 21, 1969, immediately following a regular monthly meeting of the executive board and staff, another session was held attended only by the defendants and other members of the board. At this meeting, the defendant Budzanoski informed his colleagues that he had been to Washington, D. C., and had obtained $10,000 from the International Union to be used in the re-election campaign of United Mine Workers President, W. A. "Tony" Boyle. Budzanoski then outlined the manner in which the money would be directed and funneled, without being traced, from the District's bank account and converted into cash for use in the forthcoming election campaign.

According to the Government's witnesses, the four board members were instructed by Budzanoski to prepare false vouchers indicating that they had spent a sum of money approximately $2000 each to avert the spread of wildcat "black lung" strikes from West Virginia to District # 5.[2] Under this plan, each of them would receive checks drawn on the District from Seddon in payment of the vouchers for their "expenses." They were to cash the checks and turn over the proceeds to Seddon for use during the fall presidential campaign for Boyle.

After some prodding from Seddon, Pellegrini and Halvonik each submitted vouchers to him. They received checks from Seddon in the sums of $1870 and $2370 respectively, drawn on the District's bank account in payment of the false vouchers for "expenses" in the black lung campaign. Pellegrini immediately cashed his check and turned over the proceeds promptly to Seddon on or about March 26th. Halvonik carried his check around for several months and, after several reminders from Seddon, cashed it and turned over the proceeds to him on May 29th. Later, the other two executive board members of District

# 5, Francis A. McCallister and Roland Nuccetelli, submitted their vouchers to Seddon and received $2450 and $1870 respectively. The expenses listed on their vouchers are different from Pellegrini's and Halvonik's and are not part of the indictment. They also received checks in payment therefor, and after cashing them, delivered the proceeds to Seddon. None of the payees knew what happened to the money after that point.

Seddon, with Budzanoski's knowledge, placed all of this cash in his personal safe deposit box in a Pittsburgh bank. On July 14, 1969, when the defendants concededly became aware that the Federal Bureau of Investigation was investigating the use of union funds to promote the candidacy of the incumbent president, Boyle, in his re-election campaign against Joseph "Jock" Yablonski, they withdrew all of the money ($8560) from the safe deposit box. They flew to Washington, D. C., and deposited the money in the District's general checking account.

The evidence established that the District's monthly financial reports were regularly prepared by or under the direction of its Secretary-Treasurer, Seddon. The March financial report for District #5 lists the checks to Pellegrini and Halvonik as disbursements for "organizing expenses." It does not list Pellegrini's return of the money. The April report purports to reflect the payment to McCallister and the return to the union of the proceeds of the checks cashed by Pellegrini and McCallister. The executive board approved the March and April financial reports at its meeting on May 21, 1969.

In September, the entire executive board approved the financial statement for May, June and July, which together showed the payment to Nuccetelli and the return of all the remaining money from Halvonik and Nuccetelli.

---

2. In February 1969 several thousand union miners went on wildcat strikes in West Virginia protesting inadequate compensation and medical benefits given to sufferers of a widespread miners' disease called "black lung" (pneumoconiosis). The strike spread to Pennsylvania and to three mines within the jurisdiction of District #5.

The defendants contended that the Government's story was implausible. Budzanoski, Seddon, Nuccetelli and McCallister all testified that they knew of no opposition to Boyle's re-election until May 1969. They denied Pellegrini's and Halvonik's contentions that by February rumors had circulated that two other men were going to run against Boyle, and in any case, they believed that neither man presented serious opposition. Budzanoski also claimed that the only $10,000 loan from the International to the District during the relevant months occurred in May 1969, not February.

The Government's witnesses, Pellegrini and Halvonik, supported "Jock" Yablonski in the election; defense witnesses McCallister and Nuccetelli supported the incumbent Boyle.

The defense presented its own version of the facts which was at odds with that of the Government. According to that version, the District in January 1968 had attempted to organize many of the non-union mines north and west of Pittsburgh, and it had always been short of cash in the field during the campaign. In the early months of 1969, the defendants testified that they were contemplating launching another campaign in the spring that would culminate in the fall with a major effort by International Union organizers and local union presidents. They alleged that they were urged by President Boyle to take some of the District's funds and convert them into cash so that they would not be short of funds this time.

Budzanoski testified that the only meeting he attended in Washington during the first two months of 1969 was the International Union's executive board meeting on February 24–26. A major subject of conversation was the wildcat strikes over black lung disease, and President Boyle demanded that the districts make every possible effort to prevent the walkouts. Boyle feared that the union would be sued for damages by the coal companies, and he wanted his organization on record as firmly opposed to unauthorized stoppages. To bolster his position, he asked district presidents to send in any vouchers for expenses incurred by their staffs in attempting to stop the wildcats. The vouchers would be evidence of the union's good faith attempt to uphold contracts.

Budzanoski testified at trial that in the early part of March he casually asked Marion Pellegrini if he had expended any money attempting to curb the wildcats. Pellegrini said that he had not, but Budzanoski told him that if such expenses were required, Pellegrini should spend the money because it would be proof of the union's opposition to the strikes. Budzanoski testified that Pellegrini offered to go out and spend the money, but that he, Budzanoski, cautioned against unnecessary expense. Then Pellegrini supposedly came up with the idea of submitting vouchers for expenditures he never had incurred and returning the money to the union.

Budzanoski did not like the idea at first, but, as he thought about the fall organizing campaign's need for cash, he became convinced that Pellegrini's suggestion would solve two problems at once. He told Pellegrini to estimate how much his subdistrict would need for the organizing campaign and submit the voucher in that amount. Pellegrini supposedly thought it was a good idea and promised to go ahead and do it.

Shortly after the meeting with Pellegrini, Budzanoski stated that he broached the plan to Halvonik, who immediately agreed to do the same thing. In the middle of March he talked to McCallister and Nuccetelli, and they also agreed to submit vouchers and turn the money back to the union for the fall campaign.

Budzanoski claimed that was the last he heard about the plan until March 21, when John Seddon asked him about the vouchers. Budzanoski and Seddon both testified that when Seddon gave Pellegrini and Halvonik their checks on March 20 and 21, Seddon was under the impression that they had actually incurred the expenses in attempting to curb the wildcat strikes. However, Sed-

don claimed that he was disturbed about the large amount of money being spent, and went to see Budzanoski to confer with him about the outlays.

Both defendants testified that Budzanoski then explained the voucher program to Seddon. Seddon was concerned, and Budzanoski conceded that Seddon warned him the vouchers were probably illegal. Budzanoski went on to explain that he did not see anything improper because the money was eventually to be used for a legitimate union purpose, but agreed that Seddon should talk to McCallister and Nuccetelli so that they would state different reasons on their vouchers. Notwithstanding the conversation, Seddon did not ask Pellegrini or Halvonik for new vouchers or additional information for the ones they had already submitted. Budzanoski claimed they did not attempt to change the records because the law required that no receipts or vouchers be destroyed.

Seddon put the cash into his own safety deposit box. He claimed that although the District had a safety deposit box in Pittsburgh, the key had been lost since 1965 and no one had ever taken the time to get a new one. Seddon claimed that he had the money in an envelope identifying the contents as the union's, and Budzanoski stated that Seddon gave him a receipt for the money. However, Budzanoski could not produce the receipt at trial.

At trial, the Government questioned both defendants about why they engaged in such an elaborate scheme to convert the funds to cash so long in advance of the fall "organizing" push. Seddon claimed that he had little alternative because he refused to write a check to "cash." He believed that he could only assure accounting for all funds spent if he indicated an actual payee on each check. The defendants also contended that they took the money out so far in advance of the campagin because they were never sure when their checking account would be low, and they wanted to know they had the funds reserved when the time came to use them.

Both defendants and McCallister and Nuccetelli also testified that the first time financing Boyle's re-election campaign came up was in June, when all of the executive board members with the exception of Halvonik agreed to take out loans and repay them by taking $15 out of each of their paychecks.

After the money was returned to the union's bank account in Washington in July, defendants admitted that no actual organizing push took place. They stated that because of a variety of problems, they were not able to get together the necessary resources for the campaign. As a result, it was impossible for them to show how much of the money would actually have been used in the fall drive.

Defendants, now appellants, raise numerous contentions of errors committed by the trial court. We have grouped them under three general headings: (1) The law applicable to the case; (2) Pre-trial motions; and (3) Trial errors.

## II. THE LAW APPLICABLE TO THE CASE

Appellants' first set of contentions challenges the applicability of Sections 201, 206 and 209 of the LMRDA to the false vouchers and monthly statement. They assert four arguments: (1) The vouchers and monthly financial statement were not required to be retained under Sections 201 and 206; (2) the district court erred in removing the issue of whether the payments to Pellegrini and Halvonik were disbursements within the contemplation of Section 201(b); (3) the documents could not have been examined by the Government prior to the filing of the annual report because the Government's only interest in them was in checking the annual report; and (4) Section 209 is too vague to be a valid criminal statute.

All of these contentions are without merit.

The over-riding purpose of the reporting provisions of the LMRDA is to provide union members with "all the vital information necessary for them to take effective action in regulating af-

fairs of their organization. . . ." [3]

The Senate Labor Committee declared:

> A union treasury should not be managed as the private property of union officers, however well intentioned, but as a fund governed by fiduciary standards appropriate to this type of organization. The members who are the real owners of the money and property of the organization are entitled to a full accounting of all transactions involving their property.[4]

With that information in hand, the members can prevent any questionable practices and if necessary call their leaders to account through the electoral process, which is also protected under the LMRDA. 29 U.S.C. § 481 et seq.

Therefore, the primary purpose of the reporting provisions of the LMRDA is to insure disclosure of financial operations of the unions to their members. Section 201(b) requires the filing of an annual report with the Secretary of Labor, which is to provide information on receipts and disbursements of any kind including the purposes of each such transaction. Section 206 further requires:

> Every person required to file any report under this subchapter shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary may be verified, explained or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions. . . .

■ Although no particular bookkeeping system is mandated by these provisions, when they are read in light of the legislative purpose, it is clear that whatever system is adopted, it must be able to give anyone reviewing the records an accurate picture of all the financial operations the union has undertaken. United States v. McCarthy, 422 F.2d 160, 162–63 (2d Cir. 1970), appeal dismissed, 398 U.S. 946, 90 S.Ct. 1864, 26 L.Ed.2d 286 (1970); United States v. Haggerty, 419 F.2d 1003, 1008 (7th Cir. 1969), cert. denied, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970); Rekant v. Rabinowitz, 194 F. Supp. 194 (E.D.Pa.1961).

■ Further, if the union sees fit to institute some system which preliminarily tabulates those receipts and expenditures, for instance through a set of monthly financial statements, they, too, must be retained. Section 206 underscores Congress' intention to provide anyone auditing union books with a means to check the calculations used to arrive at the annual report. Records which "provide in sufficient detail the necessary basic information . . . from which the documents filed with the Secretary may be . . . checked for accuracy and completeness" logically include those documents which would show an auditor the preliminary summaries of calculations and accounting used to translate individual transactions into a final summary. Without the retention of such documents, a check for accuracy and completeness would become immeasurably more complex and the ability to obscure or hide improper dealings would undoubtedly increase.

■ Therefore, unions are required to retain: (1) accurate, contemporaneous records reflecting all union receipts and disbursements; (2) supporting documents reflecting the entry of transactions into the union's accounts and their reproduction in the annual financial statement; and (3) any interim financial records that can serve to check that annual report. Applying these accounting principles to this case, there is no doubt that the vouchers and monthly statements had to be accurate and retained. As to the vouchers, there is no adequate alternative statement to record the purpose of the payment of funds to Pellegrini and Halvonik. Although later monthly statements may have accounted

3. S.Rep. 187, 86th Cong., 1st Session, p. 9 (1959).

4. Id., at 8.

for the funds, the March statement, even in conjunction with the other statements, presents an inaccurate version of the union's financial operations.

■ At trial the defense contended that because the money was given to executive board members who were the trustees of the union's funds and was ultimately returned to the union, there was not a disbursement within the contemplation of the LMRDA. On appeal, they have argued to us that the matter should have been left completely to the jury. However, the district court properly instructed the jury that if they believed either the Government or the defense theories, disbursements occurred when Halvonik and Pellegrini submitted their vouchers and received checks in payment therefor. The common dictionary definition of "disburse" is to "pay out" [5] and that act can generally be characterized as the relinquishment of dominion and control over funds such that there has been a diminution in the cash assets of the payor. When the two men received their checks, the District no longer exercised control over the funds. The money came into the personal possession of the board members. The argument that the District still continued to control the money because the board members were also trustees is specious.

■■ The return of the money does not negate the conclusion that there was in fact a disbursement. While in the annual report, the net effect of the disbursements to Halvonik and Pellegrini and the return of the cash was zero, the transactions still had to be reported. Even if we accept at face value the defendants' explanation of their actions, their attempt to set up a large cash fund separate and apart from the union's regular accounts is the type of financial transaction which we believe Congress wished disclosed.

If the records must be kept, appellants argue that the Government has no right to audit the union's books of account except to check the accuracy of the annual report after it has been filed. Since the Government took possession of the records prior to the filing of the annual statement, the taking was, therefore, improper.

■ This argument overlooks two significant provisions of the LMRDA. Section 601, 29 U.S.C. § 521, provides the Secretary of Labor with the power to undertake investigations to determine whether any person has violated or is about to violate the reporting and disclosure provisions of the Act, and to inspect any necessary records in the course of that investigation. He need not have probable cause for that investigation, International Bro. of Teamsters v. Wirtz, 346 F.2d 827 (D.C.Cir. 1965) (Burger, J.); Wirtz v. Local 191, Teamsters, 218 F.Supp. 885 (D.Conn.1963); aff'd. 321 F.2d 445 (2d Cir. 1963), and he is not bound by any specific time limitations as to when he can conduct his investigation.

■ Further, Section 210, 29 U.S.C. § 440, permits the Secretary to seek appropriate civil relief whenever anyone has violated, or is about to violate, any of the reporting provisions. If he can intervene where someone is "about to violate" the provisions, Congress must have contemplated the Secretary's action prior to the filing of inaccurate reports which would violate the Act. Such civil actions are viable only if the Secretary can show that there is likely to be some inaccuracy in the statements, and the only way he can sustain that burden is by an investigation of the records before the reports are filed.

■ Accepting appellants' argument would lead to a result diametrically opposed to Congress' purpose to assure financial integrity in unions. Appellants and the Government disagree whether Local 1419, ILA v. Smith, 301 F.2d 791 (5th Cir. 1962), held that union members could seek their organization's financial records under Section 201(c) for

---

5. Webster's Third New International Dictionary 644.

a period which had as yet to be included in a report to the Secretary. We believe that the facts of that case support our view that when a union member has sufficient cause to require a union to open its books for inspection under Section 201(c), he is not restricted to only such records as precede its last annual report. The desire of the Senate Labor Committee Report to stop all questionable financial practices commands no less.

■ The argument of the appellants leads to the illogical and unsound conclusion that so long as the annual report is accurate, there is no impropriety under the LMRDA if the interim records of its financial operations are false and misleading. Such bookkeeping procedures would be intolerable under any sound system of accounting.

■ Finally, appellants claim that the standard set forth in Section 209 is too vague to be a valid criminal statute under United States v. Harriss, 347 U.S. 612, 618–619, 74 S.Ct. 808, 98 L.Ed. 989 (1954), because there is inadequate notice as to which documents are covered by the section. Section 201(b) requires that the annual report and the underlying information give a detailed account of the union's financial operations that can be checked for completeness and accuracy. To supplement that directive, Section 206 specifically provides that various records, including receipts, vouchers and worksheets, must be retained. Finally, Section 209 requires that no false statement or omission be made on any of those records. When read together, we agree with the 7th Circuit, United States v. Haggerty, supra, 419 F.2d at 1007, that the sections provide a readily ascertainable standard of conduct that clearly delineates the proscribed activity. The statute is neither overly broad nor vague and gives fair notice of its prohibitions.

Appellants raise a further point that relates to the applicability of the law to their actions. They contend that the standard of wilfulness required for a violation of Section 209 is action done with evil intent or a bad motive. They urge that it was error for the district court to charge the jury that it was sufficient for the appellants to have acted in reckless disregard of the law.

■ While wilfulness, when employed in a criminal statute, generally means an act done with bad purpose, it "is also employed to characterize a thing done without ground for believing it is lawful [citation omitted], or conduct marked by careless disregard whether or not one has the right so to act [citation omitted]. . . ." United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). To determine the meaning of the word, it is appropriate to resort to the context in which it is used. Id. The LMRDA imposes serious fiduciary responsibilities on union leaders. They must take the utmost care in their stewardship of their members' funds. Section 501 of the LMRDA, 29 U.S.C. § 501. Sabolsky v. Budzanoski, 457 F.2d 1245 (3d Cir. 1972); Johnson v. Nelson, 325 F.2d 646 (8th Cir. 1963). Further, the purpose of the LMRDA is not just to prevent embezzlement and fraud; as we have noted, it is to provide information for the members so that they can control their leaders. Therefore, even when false statements or omissions are not elements of schemes to defraud, they obstruct legitimate goals of the LMRDA. However, the elimination of a requirement of evil intent or bad purpose will not operate as a trap for the unwary. There can be no basis for asserting a lawful purpose for the knowing entry of deceptive statements or the omission of accurate ones in books of account. Knowledge of false statements or misrepresentations of material facts done in reckless disregard of the law is sufficiently culpable conduct to merit punishment under Section 209. United States v. Haggerty, supra, 419 F.2d at 1008, 1009. cf. United States v. Sarantos, 455 F.2d 877, 881–882 (2d Cir. 1972); Brown v. Bullock, 294 F.2d 415, 420 (2d Cir. 1961).

## III. PRETRIAL MOTIONS

Appellants asked for severance of their trials under F.R.Crim.P. 14 on the ground that they feared the introduction of sections of each other's grand jury testimony which would be prejudicial to their own defenses. The trial court denied the severance. Budzanoski now contends that the use of Seddon's testimony for impeachment prejudiced him because of its references to him, and Seddon argues that he was prejudiced because most of the testimony at trial concerned Budzanoski. Both assert that they were prejudiced in examination because the trial judge refused to permit one counsel to repeat questions already asked by the other.

The excerpts from the grand jury testimony were not of the same character as those involved in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). There, the Supreme Court held that, in spite of a general preference for joint trials of co-defendants charged with the same offense, a severance was required when the co-defendant's confession directly inculpated the defendant. The admission was prejudicial because the defendant could not confront the co-defendant who had not taken the stand.

By contrast with *Bruton,* supra, or Nelson v. O'Neil, 402 U.S. 622, 91 S. Ct. 1723 (1971), in which the Supreme Court approved the joint trial of defendants, the impeachment testimony in this case is innocuous. The use of Seddon's grand jury statements elicited little information about Budzanoski, and nothing more damaging than a statement that he was in fact the director of the District. Further, when Seddon was cross-examined, counsel for Budzanoski made no objection to the specific questions. He also had the opportunity, unlike *Bruton,* to confront Seddon with the grand jury statements but he did not.

Counsel for both defendants participated fully at trial. The trial judge merely asked them not to repeat questions asked previously by the other counsel. That ruling was well within his discretion. It neither circumscribed counsel unfairly nor invalidated their joint trial.

On this record, we can find no prejudice resulting from the joint trial of the defendants.

Appellants next assert that they should have been granted a change of venue or a delay in trial, because of articles, published in the Pittsburgh newspapers before the trial, which detailed the various legal problems facing the United Mine Workers and President Boyle. In response to this situation, the trial judge conducted extensive *voir dire* of the panelists. The defense raised no objections to the panel selected. During trial, additional articles about the union appeared and one of defense counsel asked for a mistrial. The trial judge responded by ascertaining from the jury, which had not been sequestered, whether they had read the articles. They indicated that they had not. He thereupon instructed them not to read or listen to anything about the case in the news media.

These prophylactic measures and the lack of any demonstrated prejudice in newspaper articles or community feeling differentiate these facts from the prejudicial situations in cases such as Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and Irvin v. Doud, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The articles in the Pittsburgh cases do not accuse the appellants of having perpetrated the crimes of which they were accused, although they broadly suggest possible financial irregularities in the union. Most of the publicity mentioned in the record is directed at President Boyle and not at appellants. Appellants have not shown that the amount or the tone of adverse publicity was prejudicial.

In addition, the trial judge was most solicitous of appellants' requests for a careful screening of the jury panel. His instruction to the jury comported to the cautionary instruction contained in ABA

Standards, Fair Trial and Free Press, § 3.5, to mitigate the effect of potential media influence on the jury. All of these factors strongly support our conclusion that it was appropriate for the trial judge to refuse the motion for mistrial and the attendant requests for change of venue or delay of trial. United States v. Addonizio, 451 F.2d 49, 61 (3d Cir. 1971), cert. denied, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

■ Appellants further argue they were unduly prejudiced by the denial of their pre-trial motion for discovery of the testimony of the four unindicted co-conspirators at the grand juries convened in Washington, D. C. and Pittsburgh, Pennsylvania, as well as the complete transcript of the Pittsburgh grand jury proceeding. The request was denied in a thoughtful memorandum decision by Judge Miller.

■ We agree with the decision he reached. Since the Supreme Court's decision in Dennis v. United States, 384 U.S. 855 (1966), there has been a liberalization in the discovery of grand jury testimony. This trend culminated in the passage of Section 102 of the Organized Crime Control Act of 1970, P.L. 91–452, 84 Stat. 922, which amended the Jencks Act, 18 U.S.C. § 3500(e) to provide for the disclosure of grand jury testimony of a witness after he has testified. United States v. Farries, 328 F.Supp. 1034, 1037 (M.D.Pa.1971), aff'd 457 F. 2d 1057 (3d Cir. 1972). However, the statutory change did not affect pre-trial discovery of such testimony. It is still governed by the provisions of F.R.Crim. P. 6(e), which permit discovery "preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." [6] Therefore, there may be pre-trial discovery of the testimony of a witness when it relates to the dismissal of the indictment. United States v. Hughes, 413 F.2d 1244 (5th Cir. 1969), vacated as moot sub nom United States v. Gifford-Hill-American, 397 U.S. 93 (1970); United States v. Wolfson, 294 F.Supp. 267, 271 (D.Del.1968), or upon a showing of substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury. United States v. Politi, 334 F.Supp. 1318, 1322 (S.D.N.Y.1971); United States v. Dioguardi, 332 F.Supp. 7, 20 (S.D.N.Y.1971). See generally, 8 Moore's Federal Practice ¶6.05. Further, mere speculation that such improprieties may have occurred will not suffice to support that required showing. *cf.* United States v. Wolfson, supra, at 271.

The appellants' request for pre-trial discovery did not fall within the foregoing limitations. We do not decide here whether there are other situations where particularized need for such testimony in a pre-trial context might be demonstrated. We are satisfied that in this

---

6. It has been argued that Section 102 has limited pre-trial discovery of grand jury testimony. That position is based on the purported effect of the amendment on subsection (a) of the Jencks Act, 18 U.S.C. § 3500(a) and on F.R.Crim.P. 16(b). However, we do not believe that either provision was affected by the amendment. Section 3500(a) bars the disclosure of any statement it covers until the witness has testified at trial. But the amendment worked by Section 102 changes the definition of the word "statement" to include grand jury testimony only with regard to subsections (b), (c) and (d). F.R.Crim.P. 16(b) "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses (other than the defendant) to agents of the government except as provided in 18 U.S.C. § 3500 [the Jencks Act]." A witness' grand jury testimony does not fall into either general category. *But see,* United States v. Hughes, 413 F.2d 1244, 1255 (5th Cir. 1969), vacated as moot sub nom United States v. Gifford-Hill-American, 397 U.S. 93, 90 S.Ct. 817, 25 L.Ed.2d 77 (1970).

instance the defendants have failed to evince a sufficient showing before the district court for the transcripts they desired.

## IV. TRIAL ERRORS

Appellants finally contend that it was error for the trial judge to permit Leon Yablonski to impeach defense witness and co-conspirator Francis McCallister with regard to a conversation in which McCallister supposedly admitted to Leon and "Jock" Yablonski that the money was being drained off to support Boyle's candidacy. On direct examination, McCallister testified that the purpose of the fund was for the organizing campaign in the fall, and the Government attempted to question that assertion on cross-examination. McCallister admitted having met with the Yablonskis but denied having made the statement. On rebuttal, the Government called Leon Yablonski who stated that McCallister had made the admission. Appellants contend the statement was collateral to the proceedings, foreclosing any further inquiry into the subject after McCallister had denied making the statement.

■■ They misapprehend the situation. A matter is collateral when it cannot reasonably be considered crucial or material to the issues on trial. Berry v. Monongahela Connecting R. Co., 397 F.2d 181 (3d Cir. 1968). The issue of the purpose of the cash fund was obviously critical in this case and the trial judge properly permitted impeachment on the question. The defense was not helpless. They could and did recall McCallister, who reaffirmed his prior statement. The matter properly went to the jury in that posture.

Appellants also contend that they were denied a fair trial by the trial judge's persistent and improper interjections into the examination of witnesses, his harassment of defense counsel, and his demonstration of hostility to the appellants and their counsel. The trial of this case was lengthy, complicated, and vigorously contested. Each of the appellants was represented by separate and experienced counsel. Excessive zeal often pervaded the presentation of their cases and carried them to the outer limits of permissible advocacy. It required frequent intervention by the trial judge to maintain control of the trial and expedite its presentation.

■ In assessing the role of the trial judge, we wrote in Cromling v. Pittsburgh and Lake Erie R. R. Co., 327 F.2d 142, 151–152 (3d Cir. 1963), that:

> It is axiomatic that [his] function . . . in a federal court is much more than that of a mere arbitrator to rule upon objections and to instruct the jury. "It is his function to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties." Knapp v. Kinsey, 232 F.2d 458, 466 (6th Cir.), cert. denied, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956). To this end it has been stated that "[i]t is his duty to see that the issues are not obscured and that the testimony is not misunderstood." Ibid.

Accord, Heron v. Heron, 393 F.2d 652, 656 (3d Cir. 1968). A careful review of the record reveals that the trial judge was faithful to this command. He presided in an impartial, judicious and fair manner, designed to elicit truth, clarify issues, and maintain the dignity and order of a federal court.

We have reviewed all of appellants' numerous other assignments of error and find that none of them have merit.

The judgments of conviction will be affirmed.