UNITED STATES of America, Appellant,

v.

Sarah Elizabeth DUNCAN, Executrix of the Estate of Edna Smith.

No. 75–1526

United States Court of Appeals, Third Circuit.

Argued Nov. 20, 1975.

Decided Dec. 23, 1975.

As Amended March 5, 1976.

Rex E. Lee, Asst. Atty. Gen., Jonathan L. Goldstein, U. S. Atty., Allen H. Sachsel, Atty., App. Sect., Civ. Div., Dept. of Justice, Washington, D. C., for appellant.

George T. Dougherty, Katz, Bitterman & Dougherty, Trenton, N. J., for appellee.

Before VAN DUSEN, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This action was instituted by the United States against Sarah Elizabeth Duncan, the Executrix of the Edna C. Smith Estate, to recover monies that had been paid to Edna C. Smith. Mrs. Smith had signed the name of her deceased mother on government checks that had been issued to the mother, negotiated the checks at a bank, and then appropriated the money to her own use.

The sole defense of the Executrix was the six-year statute of limitations set forth in 31 U.S.C. §§ 129 and 131.

### I.

The named payee of the checks in question was the widow of a Civil War veteran who was receiving benefits under 38 U.S.C. § 532. In 1939, the payee died. The Veterans Administration was unaware of the payee's death and continued to issue checks in her name until July 31, 1968, when the government learned that the payee was no longer living.

Prior to the payee's death, the daughter negotiated the checks by signing the payee's name and then added her own name. From the time of the payee's death in 1939, until the government stopped issuing the checks, the payee's daughter continued to negotiate the checks by signing them with her mother's name and then adding her own name. She appropriated the funds to her own use. The daughter died on May 5, 1973, and Sarah Elizabeth Duncan was named the Executrix of her estate.

The checks received from 1939 to 1968 totaled $18,387.63. When the government learned of the invalid payments in 1968 it recovered $4,460, representing six years' worth of the checks, from the depository bank where the daughter had cashed them.[1] On July 22, 1974, the present suit was filed against the Executrix, seeking recovery of $13,547.63. The district court granted summary judgment in favor of the Executrix on February 18, 1975, and the government appealed. We vacate and remand.

### II.

This case turns primarily on the meaning of section 129. That section applies to limit, for a period of six years, actions by the government against "any endorser, transferor, or depository, or financial agent . . .."[2] The Ex-

---

1. Although the record is not completely clear, it appears that the daughter returned to the government additional checks totaling $380.

2. 31 U.S.C. § 129 provides in relevant part:
   No proceeding in any court shall be brought by the United States * * * to enforce the liability of any endorser * * * arising out of a forged or unauthorized signature or endorsement * * * of any check * * * issued by the Secretary of the Treasury * * * unless such proceeding is commenced within six years after the presentation to the Treasurer * * * of such checks * * *.

ecutrix insists that in protecting "any endorser" Congress expressed no intent to exclude improper endorsers, and that it would have taken no effort for Congress to have drafted the language necessary to restrict the benefits of section 129 to bona fide endorsers.

A statutory term, however, assumes meaning from the context in which it is used and from the backdrop of the congressional purpose in enacting the statute in question. *United States v. Bishop,* 412 U.S. 346, 356, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973); *United States v. Budzanoski,* 462 F.2d 443, 452 (C.A.3, 1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972).

The Supreme Court, in *Cass v. United States,* 417 U.S. 72, 78–79, 94 S.Ct. 2167, 2171, 40 L.Ed.2d 668 (1974), rejected the notion that it is improper to refer to legislative history when a statute can be said to be clear on its face:

. . . The Court has previously stated "[w]hen an aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'"

*United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–544 [60 S.Ct. 1059, 1064, 84 L.Ed. 1345] (1940); *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479 [63 S.Ct. 361, 362, 87 L.Ed. 407] (1943). Such aid is available in this case and we decline to ignore the clearly relevant [legislative] history . . . ."[3]

In the case of section 129, the legislative purpose behind the word "endorser" is to be found in the concern of Congress for the needs of financial intermediaries called on to process government checks. Following World War II, the volume of checks issued by the government increased dramatically, largely because of measures such as the G.I. Bill. In order to protect innocent third parties who handled such checks, Congress enacted section 129.[4]

Moreover, the immediate context of the term "endorser" in section 129 supports this interpretation of legislative intent. "Endorser" is used in conjunction with other terms—"transferor," "depository," and "financial agent"—which indicate a design to protect holders who ordinarily take checks in good faith and without notice of defects.

---

3. "It is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'" Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), *quoted in* Connell Constr. Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 628, 95 S.Ct. 1830, 1838, 44 L.Ed.2d 418 (1975).

4. The report of the House Committee on Expenditures in the Executive Department, 79th Cong., 2nd Sess. 1946, U.S.Code Cong.Service, pp. 1070–71:

The general purpose of this legislation is to provide relief for banks, merchants, and others handling Government checks by limiting the time within which the Government may bring action to recover the proceeds of such checks by reason of a forged indorsement or unauthorized signature.

\* \* \* \* \* \*

The need for ameliorative legislation is obvious. The Government today is issuing hitherto unheard of numbers of checks and warrants running into the hundreds of millions [of dollars] each year. No termination of

the liability of endorsers, banks, and others now exists with respect to endorsements of such checks and warrants. By virtue of the endorsements on the checks and warrants guaranteeing or warranting the genuineness of prior endorsements the endorsers, banks and others, are confronted with the possibility of being called upon many years thereafter to refund the amounts of checks and warrants belatedly found to bear forged or unauthorized endorsements.

\* \* \* \* \* \*

The enactment of the present legislation (H.R. 129) will afford those assisting the United States in the satisfaction of its obligations by cashing Government checks, protection of a nature which the Government itself receives under existing law with respect to claims against it.

\* \* \* \* \* \*

. . . the Committee feel it is fair and reasonable that such policy be extended to relieve banks, merchants and others from liabilities incidentally assumed in the encashment of Government checks or warrants.

Thus it appears that these sections are intended to protect innocent third parties from the liability that might be incurred as they guarantee prior endorsements in the course of handling and cashing government checks.

There is nothing in the statute that indicates that the phrase "any endorser" is intended to include someone who improperly signs the name of another in order to benefit persons who are not entitled to the proceeds. Here, Edna C. Smith signed the name of her mother on the checks, with the intent to obtain for herself something to which she was not entitled.

Cases relied upon by the Executrix do not support the application of the six-year limitation set forth in Section 129 to the conduct of one like Mrs. Smith. Rather, the apposite cases cited by the Executrix deal with the application of Section 129 in favor of financial intermediaries that had innocently accepted the instruments for value. Consonant with these decisions, the United States in this matter recognized the applicability of the six-year limitation to the bank that had guaranteed in good faith Mrs. Smith's endorsements in the course of cashing the checks proffered by her.

lows that 28 U.S.C. § 2415 and § 2416 would govern. Section 2415 states that "every action for money damages brought by the United States . . . shall be barred unless the complaint is filed within six years after the right of action accrues . . . ." Then section 2416 provides that for purposes of computing the limitation period established in section 2415, there shall be excluded all periods during which "facts material to the right of action are not known and reasonably could not be known by any official of the United States charged with responsibility to act in the circumstances."

This last provision—whether facts material to the right of action were known or could reasonably have been known by the government—creates a factual issue which the district court understandably did not address, in view of the nature of its disposition of the controversy. Therefore, it will be necessary, on remand, for the district court to deal with this question.

Accordingly, the order of February 18, 1975 granting summary judgment will be vacated, and the case remanded to the district court for action consistent with this opinion.

### III.

Since we have concluded that sections 129 and 131 are not applicable,[5] it fol-

---

5. The construction we adopt today is not inconsistent with the two-year statute of limitations in section 131. Section 131 applies to an "endorser, transferor," who fraudulently concealed his liability and provides that, apart from the six year limitation in section 129, an action against such person may not be maintained after the lapse of two years from the date the fraud is discovered. Thus, section 131 applies only to those who take in good faith and later discover that the instrument is defective and then fraudulently conceal their liability. As explained in the House Committee Report, *supra*, U.S.Code Cong.Serv. *supra*, at 1071–1072:

The purpose of the new section—No. 3 [31 U.S.C. 131]—is to exclude from the protective features of the bill those *endorsers*, transferors, depositaries or financial agents who fraudulently conceal facts concerning a forged or unauthorized endorsement in cases where, were such the facts known by the United States . . . a cause of action could be brought against such *endorsers*, transferors, depositaries or financial agents by the reason of the forgery or unauthorized endorsement.