**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harry BATH, Defendant-Appellant.**

**No. 73-1921.**

United States Court of Appeals,
Tenth Circuit.

Argued July 11, 1974.

Decided Oct. 22, 1974.

Rehearing Denied Nov. 25, 1974.

Holloway, Circuit Judge, filed a concurring and dissenting opinion.

John A. Criswell, Englewood, Colo. (William E. Myrick, Denver, Colo., and Leslie Scherr, Washington, D. C., with him on the brief), for defendant-appellant.

W. Allen Spurgeon, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., and Paul D. Cooper, Sp. Asst. U. S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

LEWIS, Chief Judge.

Harry Bath, president of Local 961, International Brotherhood of Teamsters, appeals from the judgment on his jury trial conviction under Title II of the Labor-Management Reporting and Disclosure Act. Count I of the indictment charged that Bath had knowingly reported payments of union money to hired pickets as "strike benefits" to union members in violation of section 209(b) of the LMRDA, 29 U.S.C. § 439(b); Count II charged that he willfully made false entries in records required to be kept for the purpose of verifying or clarifying the local union's annual financial reports to the Secretary of Labor in violation of section 209(c), 29 U.S.C. § 439(c). Following conviction, Bath was sentenced to 18 months' probation for each violation, to run concurrently. We affirm his conviction under section 209(b) and decline to reach the issues raised with respect to his conviction under section 209(c) since reversal on that count would not alter the sentence imposed by the court below; nor are we able to discern the possibility of any adverse consequences to Bath from our refusal to treat his appeal from the second conviction. *See* Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707; Barnes v. United States, 412 U.S. 837, 848 n. 16, 93 S.Ct. 2357, 37 L.Ed.2d 380; United States v. Sawyer, 10 Cir., 485 F.2d 195, 198.

In 1970, Local 961 struck the Centennial Turf Club, a racetrack in Denver, Colorado. Local 961 established a picket line at Centennial which was manned during the strike by at least 31 persons none of whom worked at Centennial. Four of the pickets were not members of the Teamsters union; the rest were either other members of Local 961 or members of sister Teamster locals.[1] In order to pay the pickets an hourly wage and expenses, Local 961 sent to the Teamsters International office and subsequently to the Western Conference of Teamsters a list of 80 names for whom the local purported to request "out-of-work benefits," that is, union money for members affected by a labor dispute. Of the 80 names on the list sent in request of benefits, only about 20 worked at Centennial in 1970; the rest were persons previously employed at the racetrack.[2]

The list did not name the pickets to whom the requested funds were eventually paid. In response to Local 961's requests for money, which were renewed weekly during the strike, the International and later the Conference sent a series of checks drawn on the union's strike fund. Each check was accompanied by the union's "Out-of-Work Benefits Report" form, which listed the 80 names previously submitted by the local and required signature by the listed persons acknowledging their receipt of funds. Bath and other Local 961 personnel forged these signatures on the reports, disbursed a total of $17,730 to the pickets, and then returned the reports to the International and Conference respectively. As the pickets were paid, the local's officials obtained accurate signed receipts from the actual payees and kept them in the local's records.

Bath testified that he used this method of channeling union money to his pickets in order to save time. Negotiations with Centennial had continued until immediately before its season opening. To establish quickly an effective picket line, Bath considered it necessary to obtain money by out-of-work benefits applications rather than by the slower process of applying for a grant of union funds to pay pickets. On cross-examination, he conceded that accounting for the $17,730 as payments to hired pickets rather than as benefits payments to members would have increased the local's 1970 operating losses from approximately $35,000 to approximately $52,000. Whatever Bath's purposes, however, none of the funds obtained from the International or the Conference was diverted to the personal use of Bath or any other union official.

Section 209(b) of the LMRDA prohibits any person from making a false statement or representation of a material fact in any report required under the LMRDA. Section 201(b) of the LMRDA, 29 U.S.C. § 431(b), requires every labor organization through its president and treasurer to file an annual financial report (form LM–2) with the Secretary of Labor. The LM–2 form requires disclosure, *inter alia*, of receipts and disbursements of union funds; its Schedules 8 through 12 and Schedule 14 require particularization of cash disbursements under the categories "Disbursements to Officers," "Disbursements to Employees," "Purchase of Investments and Fixed Assets," "Benefits," "Contributions, Gifts and Grants," and "Other Disbursements." Labor Department instructions accompanying form LM–2 define "Benefits" as "all disburse-

---

1. Donald Espeland, the Labor Department investigator who audited Local 961's LM–2 report, testified that 31 persons manned the picket lines in addition to an undetermined number of pickets from Teamsters Local 13. Espeland further testified on cross-examination by Bath's counsel that Local 961's bookkeeper, Mary Butler, had informed him that four of the 31 pickets were not Teamsters and eight were Teamsters. He had no further knowledge of the pickets' union status.

2. Local 961 officials testified that they did not have access to the names of Centennial's 1970 employees at the time the local applied for union benefit funds. Business agent Charles Hasslock therefore compiled the list from union dues ledger cards collected from Centennial employees between 1967 and 1969.

ments for the direct or indirect benefit of officers, employees, or members." The form's Schedule 11 which requires specification of the union's benefits disbursements requires a general disclosure of the recipients of benefits. Here Local 961's accountant entered the word "Members" beside the $17,730 figure. The instructions define "Disbursements to Employees" as "the total salaries . . allowances, and other direct and indirect expenses . . . for all employees." "Other Disbursements" is defined as disbursements that do not fit under the other more particular categories.

Count I of Bath's indictment charged that besides falsely reporting $17,730 as "strike benefits" to members under the LM–2 form's "Benefits" category, Bath knowingly failed to disclose that the money "was a strike expense paid to hired pickets." In this appeal Bath argues that even if his 1970 LM–2 form improperly listed the money under "Benefits," still his conviction cannot stand unless the evidence supports the conclusion that the sum *must* have been listed under the catch-all "Other Disbursements" category since the term "strike expenses" contained in the indictment does not appear on the LM–2 or in the accompanying instructions.

We believe that this argument entails an overly technical reading of the indictment. The essence of the charge is that Bath knowingly reported the money as having gone to members on strike when it was actually used to pay hired pickets for their time. Reading the indictment, as Bath urges, to require proof that the $17,730 could only have been reported as a strike expense under the LM–2 form's "Other Disbursements" category therefore ignores the import of Count I.[3] Such a requirement of proof, moreover, would unnecessarily

defeat the purpose of the LMRDA to insure that union officers accurately report to union members the details of all disbursements of union money. In this respect the Senate Report on the bill that became the LMRDA remarked:

> Labor organizations are creations of their members; union funds belong to the members and should be expended only in furtherance of their common interest. . . . The members who are the real owners of the money and property of the organization are entitled to a full accounting of all transactions involving their property.
>
> \* \* \* \* \* \*
>
> [U]nion members armed with adequate information and having the benefit of secret elections . . . would rid themselves of untrustworthy or corrupt officers. (S.Rep.No.187, 86th Cong., 1st Sess., 2 U.S.Code Cong. and Admin. News, 1959, at pp. 2324, 2325.)

Certainly the members of Local 961 had an interest in knowing whether members or nonmembers received union money and in knowing the purposes for which such money was paid. We believe this is precisely the interest that Congress intended to protect by enacting the LMRDA and therefore reject any reading of the indictment that unnecessarily prevents vindication of that interest.

Bath next contends that the court erred in failing to instruct the jury that it must determine whether the statements on the LM–2 form were false based upon the Labor Department's definitions as contained in its instructions to form LM–2. Instead the court instructed the jury to decide whether the disbursements "were falsely reported as strike benefits paid to members." We believe that the court's instruction as given substantially conformed to the definition of

---

3. Even assuming we adopt Bath's reading of the indictment, the government's failure to prove that the $17,730 could only have been reported as strike expenses under "Other Disbursements" need not be fatal to Bath's conviction. "It is not essential that everything in an indictment be proved. It is only neces-

sary to prove so much thereof as establishes, *prima facie*, that there has been a violation of the statute involved." United States v. Archer, 10 Cir., 455 F.2d 193, 194, *cert. denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100.

"strike benefit" that follows from the express definitions contained in the Labor Department's instructions. Accordingly, we hold that the court below provided the jury with a correct standard by which to test the falsity of the entries on the LM–2 form.

Bath finally contends that as a matter of law he could not have possessed the guilty state of mind required by section 209(b). He reasons as follows. Since the question whether the $17,730 should have been entered as a "benefit" was a matter of dispute among experts,[4] Bath could not have *willfully* intended to make a false entry. Bath, moreover, was advised by Teamsters officials to rely on the advice of his accountant in the preparation of the LM–2 form; his good faith reliance negated the possibility of his own guilty intent. Bath observes that the local's 1970 LM–2 report made no attempt to intermingle the $17,730 figure with other entries or otherwise to obscure the nature of the disbursements. He also notes that his local kept accurate written receipts from the paid pickets.

We do not believe these circumstances absolve Bath of the crime charged in Count I. Contrary to the assumption of Bath's counsel, the state of mind expressly required by section 209(b) is not willfulness but *knowledge* that the statement made in the LM–2 was false. Although statutory terms designating culpability are sometimes elastic and often used confusingly, it is clear that the government need only have proved that Bath knew that the LM–2 falsely listed as benefits paid to members money actually paid to hired pickets. Bath's signature on the LM–2 raised the presumption that he knew its contents and the evidence does not as a matter of law destroy that presumption. Nor does Bath's alleged reliance on the advice of his accountant insulate him from criminal liability. In United States v. Oates, 3 Cir., 467 F.2d 129, cert. denied, 410 U.S. 909, 93 S.Ct. 965, 35 L.Ed.2d 271, the court acknowledged reliance on the advice of an accountant as a defense to a charge under section 209(b), but refused to recognize the defense where the defendant supplied the accountant with false information with which to prepare the report. In the present case the accountant preparing the LM–2 was given access both to the receipts from the pickets to whom funds were paid and also to copies of the falsified Out-of-Work Benefits Reports. Since Bath did not offer evidence to prove that the accountant relied solely on the receipts from the pickets as the basis of the "Benefits" entry in the LM–2, the jury was free to believe that the accountant relied rather upon the falsified Out-of-Work Benefits Reports. Bath is simply foreclosed from asserting his good faith reliance upon his accountant.

Affirmed.

HOLLOWAY, Circuit Judge (concurring and dissenting):

I agree with the opinion as to the affirmance of the conviction on count I, but am unable to agree as to count II and would reverse the conviction on that count.

The opinion reasons that we should decline review of count II because no possible adverse consequences can be discerned from refusal to treat the second conviction, the sentences of 18 months' probation on each count being concurrent. However, as the Special Findings of the District Court made after trial point out, probation is not the only consequence involved here. Under 29 U.S.C.A. § 504 appellant also is barred from serving as an officer (he is President of Local 961 and holds other union offices) director, etc., of a labor organization for 5 years after such conviction, unless the Board of Parole determines that such person's

---

4. Joseph Ballew, assistant director of the Western Conference of Teamsters, defined "strike benefits" as payments to "[m]embers of the local union involved who are employees wherever the dispute has developed into a strike activity." John P. Linn, professor of law at University of Denver College of Law, testified that disbursements to hired pickets could be categorized as "benefits" to union employees.

service would not be contrary to the purposes of the statute. The Supreme Court has pointed specifically to the effect of this bar of § 504 against serving as an official of a labor union in rejecting the contention of mootness where a sentence has already been served. Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554. I feel that similar considerations apply here, calling for review.

In its Special Findings the District Court, after referring to the bar of § 504 on holding office, made several observations favorable to appellant, stating that the penalty is one the Court would not impose if it lay in its discretion, although the Court subscribed heartily to the general purpose of the statute.[1]

In these circumstances I feel we cannot say that adverse circumstances may not result for appellant from refusal to review count II. The Board of Parole will have power to determine whether or when appellant is to be relieved from the penalty of being unable for 5 years to serve in such positions as he has held. The District Court's Special Findings will serve as a factor favorable to him. Whether there are one or two separate convictions will be another factor before the Board. I am not satisfied that the circumstance of two convictions, instead of one, might not affect the Board's judgment and feel we should review count II.

As to this count, I am persuaded by appellant's argument that the Government proof did not show a violation of 29 U.S.C.A. § 439(c). Among other things, that portion of § 439 prohibits wilfully making a false entry in any books, records, reports or statements required to be kept by the statute. Section 436 imposes a requirement to maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed may be verified, explained or clarified, and checked for accuracy and completeness, including "vouchers, worksheets, receipts, and applicable resolutions. . ."

Here the proof as to count II was that there were false entries in the "Out-of-Work Benefits Report" forms sent down to Local 961 by the International and the Conference. The entries made were the signatures (which were forged) by persons acknowledging their receipt of funds. These reports were sent to the International and the Conference, but copies were kept in the Local's files. The Reports were used by the International and the Conference to plan for disbursements of cash to local union members. As the opinion points out, the Local also obtained accurate signed receipts from the actual payees and kept them in the Local's records.

To me the statute should not be construed to cover these Reports. They

---

1. Among other things the Special Findings state:

In the view of the Court, the evidence presented during the trial of this case disclosed a technical violation of the provisions of 29 U.S.C. § 439. There was no evidence of personal gain or profit to defendant and there was no evidence that defendant intended personal gain or profit. The evidence disclosed an intent on defendant's part to benefit the local union and the members of the local union represented by defendant. In substantial part, defendant's wrongful acts were the result of poor judgment, carelessness or reliance on the advice of others.

Read in the context with the crimes mentioned in the statute, the statutory penalty here imposed is fairly comparable to the imposition of statutory mandatory minimum sentences sometimes required by Congress under circumstances a court does not believe warrant such mandatory minimum penalties. The harsh penalty here imposed is one required by Congress, and the Court is given no power or discretion to lessen the impact of what will probably mean five years of economic hardship on defendant and his family. The penalty is one the Court would not impose if the penalty lay within the Court's discretion. The Congressional purpose in enacting this statute is clear, and it is one to which the Court heartily subscribes, but in the Court's opinion, the facts proven as to this defendant do not fit the intended pattern of the declared Congressional purpose, although the conviction does come within the statutory provisions.

were initiated from the other union offices and served their planning purposes. Section 436 seems to be aimed at those vouchers, worksheets, receipts and the like which are the basic papers initiated and used by the reporting unit—here the Local. The statute's application has been made to such vouchers, financial statements and cash disbursement journals of the reporting unit. *E. g.*, United States v. Budzanoski, 462 F.2d 443 (3d Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220; United States v. Haggerty, 419 F.2d 1003 (7th Cir.), cert. denied, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686. While the statute might in other circumstances reach reports having connection with two offices and their purposes, here it does not seem to me that the statute applies. As a criminal statute it must be strictly construed and any ambiguity must be resolved in favor of lenity. United States v. Enmons, 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379. Therefore I would set aside the conviction on count II.