# UNITED STATES of America

v.

## Vincent T. IMPROTO.

### Crim. No. 81-00309.

United States District Court,
E. D. Pennsylvania.

July 8, 1982.

Michael L. Levy, Asst. U. S. Atty., Philadelphia, Pa., for the U. S.

Thomas A. Bergstrom, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this case, a union officer was convicted of making a false report to the Government concerning the disbursement of union funds. His post trial motions contend there

was insufficient evidence to support his conviction and that there was error in pre-trial and trial rulings. For the reasons which follow, his motions must be denied.

Charged in a three count criminal information, Vincent T. Improto, president of Local Union No. 830 of the International Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 830),[1] was convicted by a jury on one count of violating section 209(b) of Title II of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 439(b),[2] for signing and filing a materially false LM–2 for 1980. Form LM–2 is an annually required disclosure statement to the United States Department of Labor reflecting, *inter alia*, monetary disbursements by a union to its business agents and officers.[3] Viewed in the light most favorable to the Government, as the jury's verdict requires, the evidence showed that the 1980 LM–2 filed by Local 830 and signed by Improto was materially false because it failed to report that payments of $60 each week by the union to its business agents for union expenses were kicked back to Gordon G. Grubb, secretary-treasurer of the union. Rather than reporting the expense money as indirect disbursements to Grubb, the LM–2 listed these payments as disbursements to the business agents. The testimony of the ten business agents and Matilda Garczynski, Grubb's secretary, revealed that each week, Garczynski would cash the agents' paychecks, hand them the money including the $60 allotted for expenses, and then collect the $60 for Grubb.[4] Upon receipt of the $60 from each agent, Garczynski noted payment on a list she kept.[5] There was no suggestion that Improto asked for or received any of the money in question—or that he required any of the business agents to pay it to Grubb. Because he knew of the payments to Grubb and signed the 1980 LM–2 which failed to report them, Improto violated section 439(b).

Improto has filed motions for judgment of acquittal, arrest of judgment, and for a new trial. Although there is little precedent for the issues raised by this unique fact pattern and Improto's arguments find some support in the relevant legal authority, I am compelled by the purpose of the LMRDA and the caselaw as it applies to these facts to deny defendant's motions.

Improto asserts he is entitled to judgment of acquittal because under the law and the evidence the money Grubb received came from the business agents and not from the union. In short, Improto contends that the LM–2 for 1980 was correct because the union was not required to report money paid to Grubb from sources other than the union itself and here the money came from the business agents individually.

---

1. For a time in 1981, Improto was secretary-treasurer of the union, replacing Gordon G. Grubb.

2. Title 29, United States Code, section 439(b) states in its entirety:
 Any person who makes a false statement or representation of a material fact, knowing it to be false, or who knowingly fails to disclose a material fact, in any document, report, or other information required under the provisions of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

3. Title 29, United States Code, § 431(b) states in pertinent part:
 Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—
 (1) . . .
 (2) . . .
 (3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer . . .
 (4) . . .
 (5) . . .
 (6) . . .

 . . . . .

4. Grubb offered the business agents a variety of reasons to persuade them to make the payments, including the need to have a union political fund and his own personal problems.

5. The record indicates that one business agent, Robert A. Oettl, paid monthly to Garczynski for Grubb because the agent did not live or work near the offices of Local 830. See N.T. 1–116.

The problem with this argument is that it ignores reality. Improto admits—indeed he could not contest—that an LM–2 would be false if it intentionally omitted payments to Grubb from the union. The question in this case, therefore, is whether laundering a payment to a union official by passing it through someone else's hands invalidates the federal reporting requirements as a matter of law. I conclude that it does not. The purpose of the LM–2 is to let union members know what is happening to their money. The fact that it may take a circuitous route from treasury to pocket does not change what is happening. It is fatuous to suggest that as a matter of law the government's reporting requirements were nullified because Grubb allowed the business agents to hold the $60 momentarily before he took it for himself.

Improto contends, however, that this is precisely the result compelled by the Uniform Commercial Code and the evidence. According to Improto, I should have ruled as a matter of law the union disbursed the money to the business agents and that the LM–2 was therefore correct. It follows, of course, according to this argument, that it was error to submit to the jury the question of whether the agents or the union had title to the money that was paid to Grubb.

Defendant is incorrect that the question of who had title to the money was for the court to decide as a matter of law.[6] "Whether an item is [union] property is *ordinarily a question of law*, and *when the facts so establish*, it is proper for the court to give such an instruction." *United States v. Miller*, 520 F.2d 1208, 1211 (9th Cir. 1975) (emphasis supplied). Although the basic

facts were not in dispute, the ownership of the money was the key issue in the case and depended upon inferences to be drawn by the jury. As stated in my instructions, evidence showing the money was the union's included: the relationship between the size of the payments from the union to the business agents and the size of the payment to Grubb; the frequency and regularity of the payments; the number of business agents who made payments to Grubb; the position of power which Grubb held over each business agent, i.e., the power to hire or fire; the involuntary nature of the payments, if they were involuntary; the amount of time the business agents actually had the money in their possession; the fact that the so-called "expense money payments" continued even when the business agents were on vacation; the fact that when the amount of expense money paid to the business agents increased, the payment to Grubb also increased; the fact that all transactions were in cash; and the fact that a union employee, Grubb's own secretary, took the money from each business agent, kept a record of the payments, and handed the money to Grubb. Further support for the jury finding, although not mentioned in my instruction, was that each paycheck received by a business agent was a lump sum representing his salary less deductions, plus expense money. The salary was the business agent's compensation. Because the expense money purportedly was paid to the agents to use for union purposes, it was always union money until spent for union purposes. Thus, the payments to Grubb were of union monies, never the money of the agents. On the other hand, there was evidence upon which the jury could have

---

**6.** In the cases cited by defendant, the facts were such that the court *could* properly rule as a matter of law as to the ownership of the property or money at issue. *See United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978); *United States v. Budzanoski*, 462 F.2d 443 (3d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972); *Woxberg v. United States*, 329 F.2d 284 (9th Cir.), *cert. denied*, 379 U.S. 823, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964). The caselaw, however, is replete with instances where, as in this case, the question of

title or control was properly left to the jury. *See United States v. Eden*, 659 F.2d 1376, 1380 (9th Cir. 1981); *United States v. Rowen*, 594 F.2d 98 (5th Cir.), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979); *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *United States v. Alessio*, 439 F.2d 803 (1st Cir. 1971) (per curiam); *United States v. Jackson*, 436 F.2d 39 (9th Cir. 1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971).

found the money given to Grubb was the agents' own. This evidence included the testimony of some agents that they felt the money was coming from their own pockets; the fact that even though the payments to Grubb stopped, the business agents continued to receive money for expenses from the union; and the voluntary nature of the payments; if they were voluntary. In the face of such conflicting evidence, the question was properly left for the jury. See note 6 supra.

I reject the strict Uniform Commercial Code analysis advanced by Improto that as soon as the agents' checks were cashed, a disbursement to the agents occurred because the union lost all dominion and control over the assets represented by the checks, and likewise suffered a diminution of its cash assets. See United States v. Budzanoski, supra, 462 F.2d at 451; 13 Pa. C.S.A. §§ 3603(a), 3604(a), 3802(a)(2) (Purdon 1981). First, to adopt such a rigid analysis in this case frustrates the purpose of the LMRDA to insure that all financial transactions of the union and its officers are disclosed to union members so they can root out questionable practices of union officers.[7] Second, United States v. Budzanoski, supra, offers no salvation to Improto. Budzanoski makes the point that when the payees received their checks, a disbursement occurred to them, and the union no longer exercised control over the funds. Our case, however, is different. Even though the business agents received the funds, the union, via Grubb, continued to exercise control over the money through, 1) Grubb's position of authority in the union, i.e., the power to hire and fire, continue or discontinue the payments, 2) the continuous nature of the transaction, payment and then immediate return of the money, and 3) the fact that Grubb's secretary cashed the checks and received the money immediately. Notwithstanding the above evidence,

Improto speaks of the union losing control over the funds. Actually, Grubb was the union. He controlled it in every respect, and it did what he said. When Grubb told the business agents to give him the expense money, the agents had no choice but to comply. To argue, therefore, that the union/Grubb lost control over the funds in favor of the business agents due to the intricacies of commercial law belies reality. It simply does not follow that every time someone gets a check, the payor relinquishes control of the funds which the check purports to represent. For reasons stated above, ours is the classic non-relinquishment case.

■ Further arguing for acquittal, Improto contends the Government's proof was insufficient because there was no evidence defining the monies received by Grubb as "indirect disbursements," the term charged in the information. Asserting the Government was required to prove the payments by the business agent to Grubb were indirect disbursements as an essential element of the crime charged, Improto posits that the Government's failure to do so necessitates the court grant judgment of acquittal. Although I agree that no evidence was introduced defining "indirect disbursement,"[8] I do not agree with Improto's conclusion. In charging Improto with violating 29 U.S.C. § 439(b), the Government was required to prove the following things beyond a reasonable doubt:

1. that the defendant knew Grubb was getting money from the union which the business agents had received as expense money;

2. that the defendant knew the payment of these monies to Grubb had to be reported on the 1980 LM-2, and

3. that the defendant knew the payment of these monies was not reported on

---

7. See United States v. Maxwell, 588 F.2d 568, 573 (7th Cir. 1978), cert. denied, 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979), where the Court of Appeals for the Seventh Circuit rejected the commercial law analysis followed in United States v. Collins, 464 F.2d 1163 (9th Cir. 1972).

8. Although the LM-2's were introduced into evidence, the instructions to the LM-2 containing a definition of "indirect disbursement" were not made a part of the record.

the 1980 LM–2 and therefore, the LM–2 was false.

See N.T. 4–62 to 4–63; *United States v. Ferrara*, 451 F.2d 91, 96–97 n.10 (2d Cir. 1971) *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489 (1972). Simply stated, the Government was not required to prove that monies received by Grubb were indirect disbursements.[9] A similar argument was raised and rejected in *United States v. Bath*, 504 F.2d 456 (10th Cir. 1974). In *Bath*, the defendant was convicted of violating section 439(b) because the LM–2 falsely reported $17,730. as strike benefits to members, when in reality, the money at issue was a strike expense paid to hired pickets. Arguing that the Government's proof failed because it had not shown the money could only have been properly reported under "Other Disbursements" as charged on the indictment, Bath urged his conviction could not stand. In disagreeing with Bath and refusing his motion, the Court of Appeals for the Tenth Circuit dismissed his contentions with reasoning that is applicable in this case. First, it interpreted Bath's reading of the indictment as overly technical and as ignoring the import of the charges against him. The essence of the charge against Bath was that he "knowingly reported the money as having gone to members on strike when it was actually used to pay hired pickets." *Bath, supra*, 504 F.2d at 459. The same reasoning applies here. The essence of the charge against Improto was that he knowingly reported the money as having gone to the business agents for union expenses when he knew it was actually being given to Grubb. As stated in *Bath, supra*, to require the government to prove the money was an indirect disbursement to Grubb, "unnecessarily defeat[s] the purpose of the LMRDA to insure that union officers accurately re-

port to union members the details of all disbursements of union money." *Bath, supra*. Second, the *Bath* court reasoned that even if it adopted Bath's reading of the indictment, the Government's failure of proof need not be fatal to Bath's conviction. *Bath, supra*, 504 F.2d at 459 n.2. "It is not essential that everything in an [information] be proved. It is only necessary to prove so much thereof as establishes, *prima facie*, that there has been a violation of the statute involved." *Bath, supra*, quoting *United States v. Archer*, 455 F.2d 193, 194 (10th Cir.), *cert. denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972). In this case, the government met its burden as described in *Bath* and *Archer*.

▇ I also reject Improto's challenge to my instruction regarding "indirect disbursement". My instruction, in pertinent part, was as follows:

An indirect disbursement to an officer is a payment made to another party of cash, or some other thing of value, and received by that other party on behalf of the officer. In other words, it is a payment to a third party for the benefit of the officer, made by the union.

The definition of "indirect disbursement" in the instructions to the LM–2 was:

An 'indirect disbursement' . . . is a payment made by the labor organization to another party for cash, property, goods, services or other things of value received by or on behalf of the officer. 'On behalf of the officer' means received by a party other than the officer or the labor organization for the personal interest or benefit of the officer.

3 Lab.L.Rep. (CCH) ¶ 7352. Not only do I think that the definition on the LM–2 is not exclusive, my charge was substantially similar to the LM–2 definition, and therefore, there was no error.[10] *United States v.*

---

**9.** Furthermore, that the Government could not show how the LM–2 should have been filled out to be accurate is irrelevant. This is a burden of proof above and beyond the elements of the crime.

**10.** Improto's vagueness argument was rejected in *United States v. Budzanoski, supra*, 462 F.2d at 452. There is no requirement that the

Government show how the LM–2 would have been accurate. *United States v. Budzanoski, supra*. Similarly, Improto's defense that he had no choice but to sign because he was required to by law must be rejected. Improto should have refused to sign and contacted law enforcement officials.

*Bath, supra,* 504 F.2d at 459–60. *See also United States v. Budzanoski, supra,* 462 F.2d at 451 & n.5 (court used dictionary definition of 'disbursement'). Accordingly, Improto's motion for judgment of acquittal will be refused.[11]

In his motion for a new trial, Improto contends I erred in refusing to order disclosure by the Government of the identities of the confidential informants.[12] Furthermore, because he was precluded from cross examining the witnesses as to their possible informant status, Improto claims his constitutional right to full and unfettered cross examination was denied.[13]

Some background facts are necessary before examining defendant's arguments. Evidently, people with knowledge of Grubb's kickback scheme contacted law enforcement officials. Fearful of their own culpability, these individuals sought and eventually were granted immunity. During the course of the Government's investigation into the union, these individuals continually supplied information to Special Agent Quinn John Tamm of the Federal Bureau of Investigation. Based on the information received, Agent Tamm swore out three affidavits which were the basis of three search warrants for the business records of Local 830 located in the union offices (August 15 and 18, 1980; May 7, 1981). After the May 7, 1981, search, Joel Slomsky, Esquire, counsel to Local 830 and Gordon Grubb, suspecting one or more of the business agents were confidential informants, requested each business agent sign a sworn statement that he was not an informant. Each business agent complied with Mr. Slomsky's request.[14] Improto contends my failure to compel disclosure of the informants' identities precluded him from testing the sufficiency and accuracy of Agent Tamm's affidavits, and prohibited impeachment of the informants with their false affidavits (if they were business agents), statements to Agent Tamm, and grand jury testimony. Improto also argues that he was deprived of Brady and Jencks material as to the informants.

 I will first address the disclosure issue. The Supreme Court has recognized that the government has a qualified privilege to withhold from disclosure the identity of persons who have furnished information of violations of the law to enforcement officials. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Because there is no fixed rule regarding disclosure of an informant's identity, the court must balance the public interest in protecting the flow of information to the government against the defendant's right to prepare his case. *Roviaro, supra,* 353 U.S. at 59–62, 77 S.Ct. at 627–29; *United States v. Jiles,* 658 F.2d 194, 196 (3d Cir. 1981). "The burden is on the defendant to show [a specific] . . . need for disclosure." *Jiles, supra,* 658 F.2d at 197. My finding during trial that defendant had not met his

---

**11.** Defendant's motion for arrest of judgment pursuant to Fed.R.Crim.Proc. 34 must also be denied. Initially I note that the information tracks the language of 29 U.S.C. §§ 431(b) and 439(b), and therefore, the information is facially sufficient. Furthermore, merely because the information states the money was paid by the business agents to Grubb does not preclude an interpretation that the union had title to the money. As stated in the information, the payments to Grubb were of *union* expense money. Therefore, it can be inferred the union had title to the money.

**12.** Because it has never been revealed to defendant whether there was more than one confidential informant, my use of the plural throughout this opinion should not be taken as a statement that more than one informant exists.

**13.** Improto also argues that because he did not know the identities of the informants, he may have inadvertently revealed defense strategy to them during preparation for trial. As I stated at trial, there is no reason why defendant's counsel should or would go over trial strategy with persons who are essentially fact witnesses. Furthermore, defendant had no reasonable basis to expect that the informants, or other potential witnesses, would respect confidences given to them by the defense. Therefore, this argument for a new trial is without merit. See N.T. 2–7 through 2–8.

**14.** James T. O'Connor did not swear he was not a confidential informant because at the time all such affidavits were sworn to, O'Connor no longer was a business agent.

burden to compel disclosure remains unchanged. See N.T. 2–2 through 2–9. At trial, I noted that, 1) the nature of the crime and main defenses were not dependent upon eyewitness testimony of a single event, 2) the informants were going to testify at trial, making disclosure of their identities less important than in a case where they may not appear and the defendant must know their identities to seek their production at trial, 3) the informants did not play a crucial or active role in the criminal acts or underlying events, 4) the Government had assured me that all Jencks and Brady material had been produced, a concern of the defendant in seeking disclosure of the informants' identities, 5) methods of impeachment of all witnesses could be developed irrespective of whether or not one or more was an informant, and 6) the informants might have suffered economic sanctions if their names were revealed.[15] After balancing the above observations with the defendant's need to know the informants' names, I concluded that revealing the informants' identities would probably not affect the outcome of the trial, and thus, failing to do so was not necessary for defendant to have a fair trial. In short, the lack of knowledge of the identities of the informants did not impair defendant's ability to prepare his defense. I am convinced this reasoning was valid, and my refusal to require disclosure was not error. Accordingly, I will not grant defendant a new trial on this basis.

▓▓ As to the issue of restricted cross examination, I will also deny defendant's motion for new trial. Initially, I note that the FBI 302's regarding the confidential informants were not Jencks material because the 302's were not statements of the informants. Under the Jencks Act, a statement of a witness is defined as follows:

(1) a written statement made by the witness that is signed or otherwise adopted or approved by him;

(2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof; or

(3) a statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.

18 U.S.C. § 3500 (1970) also codified in Fed. R.Crim.Proc. 26.2(f) (1980). Because the 302's do not fit into any of the above classifications, they are not statements of a witness producible under the Jencks Act. *See Palermo v. United States*, 360 U.S. 343, 351, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959); *Government of Virgin Islands v. Lovell*, 410 F.2d 307, 309 (3d Cir. 1969). Notwithstanding my determination as to the Jencks issue, if the 302's contained information favorable to the defendant on the issues of guilt or punishment, the FBI reports may have been subject to production as Brady material. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As noted repeatedly in his motions and oral argument, Improto claims the 302's, and identities of the informants, may have been of impeachment value to him.[16] *Brady v. Maryland, supra*, counsels that due process requires the production of evidence favorable to an accused where the evidence is material either to guilt or punishment. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court delineated the standards of materiality for three specific fact patterns. Cases after *Agurs* have focused on the standard of materiality where the information sought has only impeachment value. The Third Circuit in *United States v. McCrane*, 547 F.2d 204 (3d Cir. 1976), expressed the standard of materiality as follows: evidence with impeachment value only is Bra-

---

**15.** This rebuts defendant's argument that if confidential informants testified at trial under a grant of immunity, their continued confidential status resulted in a fraud on the court.

**16.** If defendant learned that one or more of the informants was a business agent, defendant could have impeached the informants with their false affidavits given to Joel Slomsky, Esquire. See p. 910 *supra*.

dy material if, when considering the entire record, it creates a reasonable doubt which otherwise did not exist. *McCrane, supra*, at 205. As stated in *Hughes v. Hopper*, 629 F.2d 1036 (5th Cir. 1980), and *United States v. McCrane, supra*, from the Third Circuit, for nondisclosure of impeachment evidence to be a Brady violation, it must have direct bearing on the credibility of a key prosecution witness. As I see it, there were *no* key prosecution witnesses in this case because all fact witnesses testified to essentially the same thing. Therefore, had defendant impeached the informants, the remaining testimony still would have been uncontradicted, and the jury's findings would have been unaffected. Accordingly, my refusal to compel the government to produce the 302's and the informants' identities was not a Brady violation. Furthermore, if defendant was restricted in cross examining the informants by a failure to know their identities or have their FBI 302's, because of the similar testimony by the other fact witnesses, defendant suffered no prejudice, and any error was harmless. *United States v. Lay*, 644 F.2d 1087 (5th Cir. Unit A 1981); *United States v. Jones*, 557 F.2d 1237 (8th Cir. 1977); *United States v. Trowery*, 471 F.Supp. 23 (W.D.Pa.1978), *aff'd mem.*, 591 F.2d 1337 (3d Cir. 1979).

 As regards the search warrants and Agent Tamm's affidavits, the cross examination issue arises in a dual context. First, defendant argues that if the informants lied to Tamm, the facts on which the search warrant were based were untrue, and therefore, the evidence seized as a result of the searches should have been suppressed. The focus of this argument misses the point. So long as Agent Tamm had good reason to believe the informants were telling the truth, and actually did believe what he had been told, Tamm could lawfully sign an affidavit that the records of Local 830 contained evidence of criminal activity by union officers. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). Whether the informants actually lied to Tamm is of tangential relevance to the issue of Tamm's state of mind when he presented the warrant affidavits to the issuing magistrate. Therefore, the proper focus is whether Tamm knowingly or recklessly provided false affidavits. *See Franks v. Delaware, supra*, 438 U.S. at 155–56, 98 S.Ct. at 2676. The record is devoid of evidence showing an intentional or reckless falsehood by Tamm. Additionally, because the evidence gathered in the searches conformed to the affidavits supporting the warrants and served as a basis for this prosecution, inferences can be drawn that Tamm did not swear falsely, and he was supplied accurate information by the informants. Accordingly, there is no merit to Improto's contention.

 Second, defendant claims that without knowing the identities of the informants and having their FBI 302's, he could not cross examine Tamm as to the accuracy of his affidavits.[17] *Franks v. Delaware, supra*, governs the procedure for challenging the truthfulness of factual statements made in an affidavit supporting a search warrant.

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally,

---

**17.** Improto also argues that the Court erred in denying his motion to suppress evidence seized during a search of Local 830's offices. As I stated pre-trial, the affidavits of Agent Tamm supporting the search warrants contained sufficient information from which Tamm and the issuing magistrate could have concluded that the informant was credible and the information reliable. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. State of Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). For example, the facts provided regarding the crime were highly specific and corroborated by the business records of the union. Furthermore, the agent was informed that the sources of the information were business agents of the union who were participants in the kickback scheme. *See Spinelli, supra*, 393 U.S. at 425, 89 S.Ct. at 593 (White, J. concurring). Finally, Tamm knew his informants were reliable because each had provided accurate information regarding criminal activity in Local 830 on several prior occasions.

or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware, supra,* 438 U.S. at 155–56; 98 S.Ct. at 2676. To mandate a hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine the affiant. *Franks v. Delaware, supra,* 438 U.S. at 171, 98 S.Ct. at 2684. Not only must the challenger point out specifically the portion of the warrant affidavit that is claimed to be false, the allegations of falsehood should be accompanied by an offer of proof. *Franks v. Delaware, supra.* Defendant did not make a showing of falsehood as required above. Rather than specifically pointing to the alleged falsehoods, defendant made conclusory allegations in a fishing expedition to cross examine Tamm. Although, defendant's insubstantial showing could be blamed on his failure to know the identities of the informants or to have their 302's, defendant could have had the business agents, whether or not one or more of them were informants, supply him with statements contradicting Tamm's affidavit. Having failed to supply contradictory statements or adequately explain their absence, defendant was not entitled to a hearing wherein he could cross examine Agent Tamm regarding the warrant affidavits. See *Franks v. Delaware, supra.* Therefore, defendant's argument regarding restricted cross examination is specious.

### CONCLUSION

Accordingly, for the above stated reason, defendant's post trial motions must be denied.

### ORDER

AND NOW, this 8th day of July, 1982, for the reasons expressed in the accompanying opinion, defendant's post-trial motions are denied and the defendant, Vincent T. Improto is ordered to report for sentence on Friday, August 6, 1982, at 9:30 A.M. in Court Room 6A, United States Courthouse, Philadelphia, Pennsylvania.