UNITED STATES of America, Plaintiff,

v.

Royal Lamarr HARDY, Loren Scott Hardy, Cassie H. Eleson, Michael Harada, Defendants.

Crim. No. 90–01466.

United States District Court, D. Hawaii.

April 29, 1991.

Daniel A. Bent by Leslie E. Osborne, Asst. U.S. Atty., Honolulu, Hawaii, for U.S.

Alexander Silvert, Federal Public Defender's Office, Honolulu, Hawaii, for Royal Lamarr Hardy.

Ignacio Garcia, Honolulu, Hawaii, for Loren Scott Hardy.

Cassie H. Eleson, pro se.

Keith Kiuchi, Honolulu, Hawaii, for Michael Harada.

ORDER DISMISSING COUNTS 1 AND 5 OF THE INDICTMENT, DISMISSING THE MOTIONS THEREBY RENDERED MOOT, AND DENYING THE VARIOUS MOTIONS FOR PRODUCTION OF GRAND JURY PROCEEDINGS, FOR SEVERANCE, AND TO DISMISS COUNTS 6 AND 7

PENCE, District Judge.

I. *Introduction*

This cause came before the court on several motions filed by various defendants.

The first two motions seek dismissal of Count 1 of the Superseding Indictment on the grounds that it is vague and duplicitous. The third motion concerns Count 5 of the Superseding Indictment and requests that it be dismissed on the ground that it is defective.

The next motion seeks production of grand jury testimony and is based on the belief that there were "irregularities and improprieties" in the grand jury proceedings and in the resulting Superseding Indictment. Defendants wish to review the transcript for such items.

Additionally, the defendants have brought two motions to sever. Defendant Harada has moved to have his trial severed from that of the other three defendants. Defendant Lamarr Hardy has moved to sever the trial of Count 5, arguing that it is factually distinct from the rest of the Superseding Indictment.

Defendants have also filed a motion seeking dismissal of Counts 1, 6 and 7 of the Superseding Indictment based on the fact that they do not state a criminal offense. In another motion, Harada has complained that Counts 1, 6, and 7 fail to allege the proper specific intent, and therefore must be dismissed.

Finally, defendants have filed a motion to strike paragraphs 5, 10 and 16 of the Superseding Indictment on the grounds that they fail to allege acts that could have furthered the conspiracy alleged in Count 1.

## II. *Background*

### A. Introduction

On September 13, 1990, the government filed a two count Indictment ("Indictment") charging defendants Lamarr Hardy, Loren Hardy and Michael Harada with the substantive crime of "money laundering" as well as conspiracy to commit the same arising out of events which occurred in August, 1990. Thereafter, on November 29, 1990, the government filed a seven count Superseding Indictment ("Superseding Indictment") which added charges of crimes arising out of activity engaged in by defendants Cassie Eleson and Lamarr Hardy which took place in February, 1989.

As indicated, the events chronicled in the Superseding Indictment involve two distinct criminal transactions. The first transaction, which uniquely involved the structuring of financial exchanges to avoid currency reporting requirements, took place in February of 1989 and was allegedly participated in by Cassie H. Eleson and Lamarr Hardy. The second transaction, which involved the same kind of aforementioned "structuring" *and* drug money laundering, took place in August of 1990 and allegedly involved Lamarr Hardy, Loren Hardy, and Michael Harada, but not Cassie Eleson. The following paragraphs detail the facts surrounding each criminal transaction.

### B. The Hardy–Eleson Transaction

The Superseding Indictment alleges that on February 2, 1989, in the District of Hawaii, Eleson spoke to one Ken Morris, who was then involved in a business transaction with Eleson's employer, Lamarr Hardy, and informed Morris that the $25,000 he was to deliver, pursuant to that business deal, should consist of cashier's checks in amounts less than $10,000 each.

On February 3, 1989, Eleson negotiated the various cashier's checks, that had been made payable to her by Morris pursuant to the Hardy transaction, in the following fashion:

a. Eleson cashed one cashier's check in the amount of $7,800 at the Kapiolani Branch of First Nationwide Bank;

b. Eleson deposited one $8,800 cashier's check to an account at First Federal Savings, and

c. Several days later Eleson cashed the $8,400 cashier's check at the Kapiolani Branch of First Nationwide Bank.

On approximately February 8, 1990, Ken Morris was told by Eleson that he could not have a refund of the $25,000 he had delivered, until Mr. Hardy authorized a refund, even though the three checks, totaling $25,000, had been made payable to Eleson, not Hardy.

As a result of the above conduct, Eleson and Hardy were charged in Count 5 of the Superseding Indictment with unlawfully, knowingly, and willfully, for the purpose of evading the reporting requirements of Title 31, U.S.C. § 5313(a), structuring and assisting in the structuring of a financial transaction, the payment of $25,000, to Lamarr Hardy by Ken Morris, in a fashion that would avoid the filing of Currency Transaction Reports, by the payment of three separate cashier's checks in amounts less than $10,000 all made payable to Cassie Eleson.

### C. The Hardy–Harada Transaction

On August 10, 1990, the Lamarr Hardy agreed to process, for IRS undercover agents, large amounts of U.S. currency, which he allegedly believed to be the proceeds of alleged drug transactions, in such a way that none of the federal currency transaction reporting requirements would be triggered. Hardy indicated to the agents that he had a contact who was the owner of Hawaii Check Cashing Service and that "money laundering" could be conducted at the outlets of that company.

On August 14, 1990, during a meeting with undercover agents arranged by Hardy, defendant Michael Harada, who stated he was the owner of Hawaii Check Cashing Service, agreed to accept three percent of the gross amount of currency exchanged through his check cashing business for Bank of Hawaii orders as payment for his services and for the utilization of Hawaii Check Cashing Services.

Then, also on August 14, 1990, Harada personally imprinted nine $1,000 money orders and provided them to one of the undercover agents in exchange for U.S. currency. Thereafter, on the same day, Harada accompanied the undercover officers to another one of his check cashing outlets and advised one of the officer as to how much currency he should convert into money orders at that location.

On August 15, 1990, Hardy accepted the payment of $930 from the undercover agents, which represented his three percent commission for assisting with the purchase of $31,000 in personal money orders that

had occurred at Hawaii Check Cashing Service locations the previous day.

Later that same day, the undercover agents met with Harada and discussed the amounts of cash that should be exchanged for money orders at each Hawaii Check Cashing Service location. Additionally, Harada accepted $930 from the undercover agents which represented his three percent commission for the purchase of $31,000 in personal money orders that had occurred at Hawaii Check Cashing locations the previous day. Further, Harada imprinted seven money orders that day totalling $6,500.

Also on August 15, 1990, defendant Loren Hardy, Lamarr's brother, accompanied two undercover agents and visited six outlets of Hawaii Check Cashing Service. At five of the locations, he conducted a transaction in the amount of $6,500, during which cash was exchanged for seven personal money orders drawn on the Bank of Hawaii. Thereafter, Loren Hardy accepted approximately $200 for his efforts in obtaining the thirty-five money orders on August 15, 1990.

On August 16, 1990, defendants Lamarr and Loren Hardy visited undercover agents for the purpose of obtaining a large amount of cash to be "laundered" through the purchase of additional personal money orders at Hawaii Check Cashing Service and other places. During the course of that meeting the Hardy Boys took and received approximately $168,000, the alleged proceeds of dealing in narcotics, for the purpose of converting that cash into personal money orders and other negotiable instruments. It was understood that these negotiable instruments were then to be delivered to the undercover agents.

Also on that day, Lamarr Hardy accepted $10,000 as his prepaid commission for the intended "laundering" of $168,000 in cash, represented to be drug money, from the undercover agents. Additionally, Hardy accepted his $15,000 commission as well as Harada's $1500 commission for the money that had been converted to money orders at Hawaii Check Cashing Service locations on August 15, 1990.

### D. Component Sections of the Superseding Indictment

All of the aforementioned defendants are charged in the seven-count Superseding Indictment with conspiracy to launder drug money and to structure financial transactions to avoid reporting requirements from January 30, 1989 through August 16, 1990. In Count 1, all the defendants are charged with a general conspiracy which incorporates as its objects the remaining counts in the Superseding Indictment.

In Counts 2, 3, and 4, Lamarr Hardy is charged with substantive counts of laundering drug money with codefendant Loren Hardy on August 14 and 15, 1990. In Counts 6 and 7, Lamarr Hardy is charged, along with codefendants Loren Hardy and Michael Harada, with structuring financial transactions in order to avoid reporting requirements on August 14–15 1990.

Thus, Counts 2, 3, 4, 6, and 7 exclusively deal with the "second criminal transaction," which occurred in August of 1990 and involved the laundering of monies allegedly represented to have been the proceeds of drug deals made by undercover IRS agents.

In Count 5, Lamarr Hardy is charged with structuring financial transactions with codefendant Cassie Eleson. This count deals exclusively, however, with the "first criminal transaction," which occurred in February of 1989 and involved a structuring incident in which no IRS agents, Loren Hardy, or Michael Harada ever participated, and which has no apparent temporal or substantive connection with the August, 1990 transaction.

More specifically, Count 5 involves an alleged incident in which Ken Morris, an investor in an enterprise with Lamarr Hardy, claims that Lamarr Hardy and Cassie Eleson structured Morris' investment payments in such a way as to avoid financial reporting requirements. Other than the blanket conspiracy charge in Count 1, defendant Cassie Eleson appears as a defendant only in Count 5.

### III. *Discussion*

#### A. Hardy and Harada's Motions to Dismiss on the Grounds of Duplicity and Vagueness

In their Motions to Dismiss Count 1 of the Superseding Indictment on Grounds of Vagueness and Duplicity, defendants Hardy and Harada argue that Count 1 of the Superseding Indictment is vague (argued only by Harada) and duplicitous (argued by both) because it alleges multiple objects of one conspiracy and/or because it charges defendants with two separate conspiracies. With respect to the double conspiracy charge, defendants maintain that Count 1 simultaneously charges all of the defendants with: (1) the conspiracy between Hardy and Eleson and (2) the conspiracy among the Hardy brothers and Harada.

##### 1. *Vagueness*

■ Only Harada moves to dismiss Count 1 on grounds of vagueness. He argues that, conceding Count 1 alleges only one conspiracy, the Superseding Indictment is vague because it alleges two separate objects of the conspiracy and thus clouds what the actual objective of the conspiracy was to be. However, in the next breath, while advancing his duplicity argument, Harada concedes that "Federal courts in the District of Columbia and the Fifth Circuit have found that merely charging two offenses as the objective of the conspiracy is not in and of itself a basis for the court to dismiss the indictment." Harada Memorandum at 4. Accordingly, no such basis for dismissal is present here either.

Defendant additionally attempts to support his vagueness argument by citing a case from the Sixth Circuit, *United States v. Piccolo*, 696 F.2d 1162 (6th Cir.1983). In *Piccolo*, a criminal defendant's conviction for conspiracy to distribute and possess cocaine was reversed because the government had failed fully to articulate the theory of conspiracy that it was proceeding on. Harada claims that Count 1 of the Superseding Indictment suffers from the same defect.

■ However, in this case the government has clearly satisfied its obligation of

articulating its theories of conspiracy in Count 1 of the Superseding Indictment. That count alleges one or more conspiracies to structure financial transactions to avoid currency reporting requirements and to launder money. Therefore, *Piccolo* is inapposite and Harada's vagueness argument must fail.

### 2. *Duplicity*

With respect to duplicity, both defendants argue that Count 1 should be dismissed because it alleges two distinct offenses or conspiracies. Charging two offenses in one count of an indictment is contrary to Rule 8(a) of the Federal Rules of Criminal Procedure, which mandates that an indictment contain "a separate count for each offense." The joining in a single count of two or more distinct offenses is termed "duplicity." *See generally* 1 Wright, *Federal Practice and Procedure* § 142 (2nd ed. 1982); 8 *Moore's Federal Practice and Procedure* § 8.03 (2nd ed. 1984).

Several Ninth Circuit opinions have had occasion to analyze the law regarding duplicity in indictments. *See, e.g., U.S. v. Gordon,* 844 F.2d 1397 (9th Cir.1988) (conspiracy count in indictment was duplicitous, and thus violated defendants' right to unanimous jury verdict, where count alleged conspiracy to defraud Government in administration of weapon program, and conspiracy to obstruct grand jury investigation of fraud); *U.S. v. Aguilar,* 756 F.2d 1418, 1422 (9th Cir.1985) (information, each count of which charged defendant with "acting as" officer of United States Immigration and Naturalization Service and "obtaining money in such character," suffered from duplicity, since each count alleged two separate and distinct offenses).

The vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him, since conviction on a duplicitous count could be obtained without a unanimous jury verdict as to each of the offenses contained in the count. *See U.S. v. Aguilar,* 756 F.2d at 1420; *U.S. v. UCO Oil Company,* 546 F.2d 833, 835 (9th Cir.1976).

A duplicitous indictment may also eviscerate the defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged. *See Abney v. United States,* 431 U.S. 651, 654, 97 S.Ct. 2034, 2037, 52 L.Ed.2d 651 (1977).

■ In this case, defendants argue that Count 1 of the Superseding Indictment charges two different offenses, to wit, a conspiracy which occurred in February 1989 and a wholly distinct and separate conspiracy which occurred in August 1990. Defendants' argument has merit.

Count 1 of the Superseding Indictment alleges that all of the defendants conspired to commit the offenses of "money laundering," in violation of 18 U.S.C. § 1956(a)(3)(A), (B) and (C), and "structuring financial transactions to avoid currency reporting requirements" ("structuring") in violation of 31 U.S.C. § 5324(1) and (3). However, paragraphs 1 through 3 of the "Overt Acts" section of Count 1 of the Superseding Indictment indicates the existence of a discrete, self-contained criminal transaction which occurred in February 1989 and involved acts of "structuring" in connection with a business transaction entered into between Lamarr Hardy and Ken Morris. This criminal transaction was participated in uniquely by Lamarr Hardy, Ken Morris (who was not indicted), and Cassie Eleson.

Then sections 4 through 16 of the "Overt Acts" section goes on to indicate the existence of yet another discrete, self-contained criminal transaction which occurred in August 1990 and involved acts of "money laundering" in connection with a government-fabricated undercover transaction between the Hardy brothers, Harada and IRS undercover agents. The Superseding Indictment fails to allege any nexus whatsoever, chronological, substantive or otherwise, between the February 1989 transaction and the August 1990 transaction which took place over a year and half later and involved entirely different actors and circumstances.

From the face of the Superseding Indictment, it appears that the February 1989

transaction arose out of a business deal between Hardy and Morris and the August 1990 transaction arose spontaneously when Hardy was contacted by undercover agents and enlisted the support of his brother and Harada. Thus, Count 1 of the Superseding Indictment runs afoul of Fed.R.Crim.P. 8(a)'s proscription against charging two offenses in one count of an indictment.

This conclusion is verified by the Ninth Circuit's analysis in *U.S. v. Gordon*, 844 F.2d at 1397. In *Gordon*, defendants were convicted of conspiracy pursuant to Count I of the indictment filed against them. On appeal, defendants contended that Count I of the indictment was duplicitous because it impermissibly charged two conspiracies in a single count, to wit, conspiracy to defraud the government in administration of the weapons program and conspiracy to obstruct a grand jury investigation of said fraud.

In deciding whether Count I was duplicitous, the Ninth Circuit formulated the following test:

> To determine whether Count I charged one or two conspiracies, we look at 'whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy.' [citation] The relevant factors in determining the existence of such an 'overall agreement' are the nature of the scheme, the identity of the participants, the quality, frequency and duration of each conspirator's transactions, and the commonality of times and goals.

*Id.* at 1401. The Ninth Circuit then went on to apply the test:

> Looking at these factors, we find that Count I charged two conspiracies—one to defraud the United States in the administration of the Trident Missile Program, and another to obstruct the grand jury investigation. The nature of the scheme suggests two conspiracies. The primary agreement between Gordon, Loeswick and Edler was to use inside information to secure government contracts for Edler Industries in return for payoffs. The evidence does not show

that the parties contemplated or discussed any plans for a cover-up. We cannot imply a subsidiary conspiracy to conceal the crime. [citation omitted] The conspiracy to obstruct justice was pursuant to a separate agreement, made after Loeswick was subpoenaed by the grand jury. The commonality of time factor also points to two conspiracies. The last kickback transaction occurred in August–September 1983 while the conspiracy to obstruct the grand jury investigation did not begin until Loeswick was subpoenaed in March of 1984.

*Id.*

The same analysis applies with equal force to the instant case. Count I of the Superseding Indictment appears to charge two conspiracies—one to structure financial transactions to avoid currency reporting requirements arising out of a business transaction and another to similarly structure financial transactions and to launder money arising out of an unconnected government sting operation.

As in *Gordon*, the nature of the two schemes here suggests two conspiracies. The agreement between Hardy and Eleson was to aid a business client in structuring a financial transaction so as to avoid currency reporting requirements. The agreement between the Hardy brothers and Harada was primarily to launder alleged proceeds of drug sales for what turned out to be undercover IRS agents.

The record and the Superseding Indictment itself does not indicate that the parties to the first criminal transaction contemplated or even discussed with the parties to the second criminal transaction, any plans to carry out the second transaction, or, for that matter, any additional future transactions at all. The conspiracy to launder drug money for the IRS agents, just like the conspiracy to obstruct justice in *Gordon*, was pursuant to a separate agreement made after the transaction with Morris was complete. It should be noted, though, that there is even stronger evidence of separate conspiracies here, since in *Gordon* each party to the first conspiracy was also a party to the second conspir-

acy while in this case, the parties to the first conspiracy are, with the exception of Lamarr Hardy, entirely different from the parties in the first conspiracy.

The commonality of time factor also points to two conspiracies. In *Gordon,* the court found a sufficient time lapse to find two separate conspiracies where the last kickback transaction of the first series of events occurred in August–September 1983 while the series of events leading to obstruction of the grand jury investigation did not begin until Loeswick was subpoenaed in March of 1984, a lapse of five months. Here, the last event in the first criminal transaction occurred in February 1989 [1] while the first event in the second criminal transaction did not occur until August 1990, a lapse of eighteen months.

In response, the government argues that Count I charges a single conspiracy which has as its object the commission of several crimes and thus Count I is not duplicitous. The government's semantic ruse is not persuasive. While Count I may allege several crimes as the object of conspiratorial activity, the fact remains that the antecedent conspiratorial activity consists of two different conspiracies: (1) the agreement between Hardy/Eleson and Morris and (2) the agreement among the Hardy brothers, Harada, and the undercover agents. Therefore, Count I violates the strictures of Fed.R.Crim.P. 8(a) and must be dismissed.

■ This is true notwithstanding the government's insistence that even where duplicity has been found to exist in an indictment, any prejudice to the defendant can be corrected by a proper jury instruction and that a duplicity challenge is cured when the jury is properly instructed. However, this court chooses to heed the time-honored adage that "an ounce of prevention is worth a pound of cure." This is

particularly true, where, as here, the preservation of defendants' Fifth and Sixth Amendment rights hangs in the balance. In light of the potential infringement of these rights if this court chose to roll the dice and preserve the confusion of Count I until a jury instruction at the end of trial, the Ninth Circuit's observation concerning the timing of duplicity objections is particularly instructive: "A duplicity objection can easily be made before trial because a duplicity claim is directed at the *face* of the indictment and not at the evidence presented at trial." *Gordon,* 844 F.2d at 1400.

Count 1 of the Indictment, although not vague, is duplicitous and must be dismissed.

### B.  Motion to Dismiss Count 5
#### 1.  *Mischaracterization of the Bank Check*

Count 5 of the Superseding Indictment alleges that Lamarr Hardy, together with Eleson, structured a financial transaction in a manner calculated to avoid mandatory reporting requirements, in violation of 31 U.S.C. § 5324(1) and (3). The three payments at issue, however, were made by *bank check,* not by *cashier's check* as stated in the Superseding Indictment. This discrepancy, argues Lamarr Hardy, warrants dismissal of the Count.

The government argues that the operative word is "check" and that the adjective used to describe the check is immaterial. Indeed, the government suggests that the word "cashier's" could be struck from the Superseding Indictment with no impact whatsoever. In fact, the checks are labeled neither "cashier's check" nor "bank check," but "official check." The court will not delve into the definitions of these various terms—neither party has discussed the distinction between these various types of checks or suggested that such a distinc-

---

[1]. It must be pointed out that paragraph 3 in the "Overt Acts" section of the Superseding Indictment charges that "on approximately February 8, 1990, Ken Morris was told by Cassie H. Eleson that he could not have a refund of the $25,000 he had delivered, until Mr. Hardy authorized a refund, even though the three checks, totaling $25,000, had been made payable to

her." This "overt act" appears to have no material connection to the charge of conspiracy to illegally structure financial transactions. It appears to this court that the government threw in this paragraph in a disingenuous attempt to show chronological proximity between the first and second criminal transactions.

tion, to the extent they can be meaningfully distinguished, is in any way material to the crime charged.

### 2. The Statute's Application Only to "Transaction[s] in Currency"

■ The more interesting issue raised by Lamarr Hardy, however, is whether the "official checks" in question constitute "currency" sufficient to bring the transaction within the scope of the statute. Count 5 charges Defendants with violating 31 U.S.C. § 5324(1) and (3), which provides, in part:

No person shall for the purpose of evading the reporting requirements of section 5313(a) ... structure or assist in structuring, or attempt to structure or assist in structuring any transaction with one or more domestic financial institutions.

The statute refers to § 5313(a), which, in turn, provides:

When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States *coin or currency (or other monetary instruments the Secretary of the Treasury prescribes)*, in an amount ... or under circumstances the Secretary prescribes by regulation, the institution ... shall file a report on the transaction in the way the Secretary prescribes.

(Emphasis added.) The references to what "the Secretary prescribes" prompt examination of the applicable regulations, which are found at 31 C.F.R. § 103. Specifically, § 103.22(a)(1) provides

Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a *transaction in currency* of more than $10,000.

(Emphasis added.) "Transaction in currency" is defined at 31 C.F.R. § 103.11(r):

*Transactions in currency.* A transaction involving the physical transfer of currency from one person to another. *A transaction which is a transfer of*

*funds by means of bank check*, bank draft, wire transfer, or other written order, *and which does not include the physical transfer of currency is not a transaction in currency within the meaning of this part.*

Hardy argues that this regulation specifically exempts the bank check transaction that forms the basis for Count 5 from the reporting requirements of 31 U.S.C. § 5313. Although the statute itself contemplated application to "monetary instruments [which] the Secretary of the Treasury prescribes," it appears from the regulations that the Secretary of the Treasury did not actually prescribe any monetary instruments unless actual currency is also involved.[2]

One might argue that use of a bank check, rather than currency, is simply another aspect of "structuring" to evade reporting requirements. Because the reporting requirements of § 5313 apply only to "transactions in currency," someone who purposefully utilizes monetary instruments other than currency for the purpose of frustrating the reporting scheme, might be deemed to have "structured" the transaction in violation of § 5324. This argument fails by the definition of "structuring":

[A] person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more *transactions in currency*, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements....

31 C.F.R. § 103.11(p) (emphasis added).

Whether cashier's check or bank check, the literal terms of the regulations do not appear to permit application of the statute to this transaction. The government does not address this issue at all in its memorandum, but simply asserts that § 5324 "was enacted precisely to make the transaction at issue here illegal," and that "defendants

---

**2.** The regulations define "monetary instruments" to include "[a]ll negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks...." 31

C.F.R. § 103.11(m). "Currency" is defined as "[t]he coin or paper money of the United States or of any other country that is designated as legal tender." 31 C.F.R. § 103.11(e).

[sic] position ignoring [sic] both the purpose [sic] of Section 5324 and [the regulations]." [3]

The analysis cannot stop here, however. Although neither party cited any case law, there is one decision that directly addresses this argument: *United States v. Torres Lebron*, 704 F.Supp. 332 (D.Puerto Rico 1989). In that case, the cash was converted to winning lottery tickets, which were subsequently exchanged for certificates of deposit ("CDs"). Under the procedure, repeated on five occasions, bundles of cash were brought to the bank, counted by bank tellers under the supervision of a bank officer, and then informally exchanged for bank checks for winnings from the Puerto Rico lottery, provided by a lottery ticket vendor. The formal transaction conducted *by* the bank was the exchange of these lottery checks for CDs. Defendants advanced precisely the same argument as has been advanced here: because the transaction processed by the financial institution involved no currency (just bank checks from the lottery and certificates of deposit) there was no duty to report the transaction, so there could be no criminal liability for structuring the transaction. The court was not persuaded:

> Defendants argue that the only relevant transactions here were the defendants' purchase of CDs with checks issued payable to them by the Puerto Rico lottery. We concede that such "transactions," viewed in a vacuum, do not in and of themselves trigger a duty on the part of the bank to file CTRs [Currency Transaction Reports]. "Transaction," however, is a "word of flexible meaning" which "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon the logical relationship...." *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 [46 S.Ct. 367, 371, 70 L.Ed. 750] (1926). Hence, just as courts
>
> have refused to view "broken up" cash transactions of less the $10,000 occurring at the same bank on the same day in a vacuum, [citations omitted], so too must we look beyond the "paper trail" in order to evaluate the transaction at issue here as a whole.
>
> In the case at bar the indictment charges that on at least five separate occasions defendants conspired among themselves and aided and abetted each other in effectuating an elaborate money laundering scheme whereby bundles of cash in excess of $10,000 were "physically transferred" *through* Citibank, and with the aid of its officers and employees, from the Torres Lebrons to Gonzalez Couso and his associates, in exchange for lottery checks which were in turn used to purchase CDs at the bank. Thus, the transaction, when viewed as a whole, fits squarely into the Act's definition: a physical transfer of currency in excess of $10,000 from one person to another which is conducted through a financial institution. It is axiomatic that defendants are alleged to have been aware of the statutory duty to report such "transactions in currency," as well as the illegality of deliberate efforts to evade said duty.

*Torres Lebron*, 704 F.Supp. at 335–36 (emphasis in original).

Critical to this case, however, was the fact that the cash was brought to the bank, and counted by bank tellers under the direction of a bank officer, before it was exchanged for lottery checks. Hence, the reason for the language in the opinion about the money, "cash", passing *"through* Citibank" becomes apparent. *Torres Lebron* stands for the proposition that in examining financial transactions under § 5324, the court must look at the bigger picture, and consider all aspects of the larger transaction. Because the bank-

---

**3.** It appears from the regulations, at least, that this type of transaction was *not* the type that Congress intended to prohibit. If Congress was motivated by concern for laundering drug proceeds, it makes sense that Congress would target only cash transactions. Ultimately, drug transactions are cash transactions, so although a commercial transaction by bank check could be structured to avoid reporting requirements, that type of transaction is not what Congress has targeted for scrutiny. Only if the transaction involves currency is it suspect, and within the reach of the criminal statute underlying this indictment.

check-for-CD transaction was directly and immediately traceable to currency, the larger transaction involved currency and the statute applied.

The instant case appears to be factually distinguishable. There is no mention here of the bank checks being funded by more than $10,000.00 in currency. There do not appear to be allegations that the three payments by bank check were part and parcel of a larger transaction involving cash.

Accordingly, the facts as presented to the court do not support the criminal charge contained in Count 5, and the same must be dismissed.

### C. Motion for Production of Grand Jury Proceedings

The Defendants seek production of a transcript of the grand jury proceedings. Lamarr Hardy argues that the "cashier's/bank check" discrepancy raises doubts about the accuracy of information given to the grand jury, and that the proceedings should be reviewed for further misinformation. Eleson similarly bases her request on the "apparent irregularities and improprieties of the Indictment."[4] Harada seeks the transcript because he "has received information, through his counsel, that the U.S. Attorney may have misinstructed the federal grand jury," and wishes to ascertain whether this occurred and whether it constitutes misconduct sufficient to dismiss the Superseding Indictment.

4. Eleson's cited "irregularities" include not only the "cashier's/bank check" problem, but also, among other things,

   1. On Counts 5, 6 and 7 there is no statement that the grand jury charged the crime;

   2. Eleson has raised the irregularities but was denied a Bill of Particulars;

   3. Eleson has not consented to the court's jurisdiction;

   4. Eleson has not been informed of the Nature and Cause of the Accusation against her, in violation of her "Sixth Amendment ... Inalienable Right to Liberty as a Sovereign;"

   5. Eleson has not been arraigned pursuant to Fed.R.Cr.P. 10.

   6. The government has not established jurisdiction and venue, "after ELESON had OBJECTED to any assumed or Secret Jurisdiction;"

None of the defendants cites any law in support of his motion for production of grand jury proceedings, but the motion would apparently be based on Rule 6(e)(3)(C), which provides:

Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

   \*     \*     \*     \*     \*     \*

   (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury....

This is merely an exception to the general rule that grand jury proceedings are kept secret. Fed.R.Cr.P. 6(e)(2).

■ The United States Supreme Court has recognized that proper functioning of the grand jury system requires secrecy of grand jury proceedings. *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958). The proceedings are not to be disclosed absent a showing of "particularized need." *Illinois v. Abbott & Assoc., Inc.*, 460 U.S. 557, 567, 103 S.Ct. 1356, 1361, 75 L.Ed.2d 281 (1983).[5]

The Ninth Circuit has not clarified what constitutes such "particularized need." It *has*, however, given considerable attention to what does *not* constitute "particularized need." In *United States v. DeTar*, 832 F.2d 1110 (9th Cir.1987), the Ninth Circuit held as insufficient the movant's allegation that an unnamed grand juror told him that

   7. Eleson has "Particularized Need" (not specified), and her due process rights are being violated; and

   8. Eleson has a right to know what law was read to the grand jury, as a matter of public record, not subject to "Secrecy".

5. The *Abbott* court cited *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1978) for that proposition. *Douglas* held that

   Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.

*Id.* at 222, 99 S.Ct. at 1674.

a previous grand jury had voted not to indict. *DeTar*, 832 F.2d at 1113. "It is not sufficient for [movant] to assert that he has no way of knowing whether prosecutorial misconduct occurred." *DeTar*, 832 F.2d at 1113 (citing *United States v. Bennett*, 702 F.2d 833, 836 (9th Cir.1983)). "Speculation cannot justify th[e] court's intervention into the grand jury's proceedings." *United States v. Claiborne*, 765 F.2d 784, 792 (9th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986); *see also United States v. Walczak*, 783 F.2d 852, 857 (9th Cir.1986); *United States v. Ferreboeuf*, 632 F.2d 832, 832 (9th Cir.1980) ("Mere 'unsubstantiated, speculative assertions of improprieties in the proceedings' do not supply the 'particular need' required to outweigh the policy of grand jury secrecy." (citations omitted)).

The Third Circuit *has* clarified what will satisfy the "particularized need" standard for purposes of Rule 6(e)(3)(C). It requires a showing of "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972), *quoted in United States v. Gatto*, 746 F.Supp. 432, 480 (D.N.J.1990).

■ It is clear that on the alleged facts there is little more than "mere speculation" to support the motion for discovery of the grand jury proceedings. The "cashier's/bank check" discrepancy falls far short of demonstrating a "substantial likelihood of gross or prejudicial irregularities" in the grand jury's conduct. *Budzanoski*, 462 F.2d at 454. Harada's suggestion that he "has received information, through his counsel, that the U.S. Attorney may have misinstructed the federal grand jury," is the same type of vague unsubstantiated allegation as appeared in *DeTar*, where an unnamed grand juror had purportedly told the defendant that an early grand jury had voted against indictment.

In an attempt to substantiate the claim of irregularity, defendants filed a supplemental affidavit from William Montelongo, who testified before the grand jury in return for immunity. Montelongo's represents that while testifying regarding the search of the Wahiawa Check Cashing store, a grand juror asked Assistant U.S. Attorney Les Osborne whether the search was legal. Osborne said "yes." Montelongo then stated that during the search he had requested, but was refused, permission to call someone (not necessarily an attorney) who represents the Wahiawa Check Cashing store. The grand juror repeated his inquiry as to the legality of the search as well as the legality of the denial of permission to call counsel. Osborne replied that the procedure employed was legal because Montelongo could have made the call upon leaving the premises although no one was allowed to leave during the search.

This affidavit testimony is apparently offered not to suggest that the search was illegal (this is not a motion to suppress the discovered evidence) but to support the claim of irregularity in the grand jury proceedings. Although they do not explain how or why, defendants apparently believe that Osborne's responses to the grand juror's questions were legally erroneous, and that the grand jury proceedings must be produced so they can examine and evaluate this "irregularity."

■ This argument is also found wanting. The legality of the search is an issue that may be properly considered on a motion to suppress, but no such motion has been made. This is a motion for production of grand jury proceedings, for which defendants must show irregularity in those proceedings. Even if defendants argued and proved that the search was illegal, presentation of the resulting evidence to the grand jury was still legally proper. Illegally obtained evidence *is* admissible before a grand jury. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Because there is no irregularity if the evidence submitted is illegally obtained, it can hardly be an irregularity that the grand jury may have been erroneously advised that the evidence was legally obtained.

The Motion for Production of Grand Jury Proceedings, therefore, must be denied.

### D. Motions to Sever

### 1. *Lamarr Hardy's Motion to Sever*

In his Motion to Sever, defendant Hardy moves this court, pursuant to Fed.R. Crim.P. Rule 8(b) and Rule 14, to sever Count 5 of the Superseding Indictment as it involves a separate and distinct conspiracy. Because the court dismisses Count 5, it need not address the issue of severing that count from the rest of them.

### 2. *Harada's Motion to Sever*

Because of the prejudice likely to result at trial due to the inclusion of Count 5 in the Superseding Indictment, defendant Harada moves this court for an order severing his trial from that of the other defendants. Again, Count 5 is dismissed, eliminating any grounds for Harada's motion. Because there is no longer any danger of such prejudice, Harada's Motion to Sever must be denied.

### E. Motion to Dismiss Counts 1, 6 and 7

■ Defendant Harada has moved to dismiss Counts 1, 6, and 7 of the Superseding Indictment on the ground that those counts do not charge an offense which is criminal.[6] He first argues that the Counts do not allege facts which would trigger reporting requirements since his business, Hawaii Check Cashing, is actually a business name that is operated by separate and distinct corporations and the statute requires the transactions to be conducted at at one specific outlet. Second, he argues that his failure to report is due entirely to the fact that he was arrested and detained, and that the government thereby prevent his compliance with reporting requirements. Third, he contends that he is altogether exempt from the reporting requirements since he is a "check-cashing service" and not a "financial institution," within the terms of the statute.

■ However, all of Harada's arguments here raise *questions of fact*, not appropriate for resolution at this stage of the proceeding. The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged. *United States v. Citron*, 783 F.2d 307, 314 (2d Cir.1986). In determining whether an indictment sufficiently informs the defendant of the offense, courts give the indictment a common sense construction. *United States v. Reed*, 721 F.2d 1059, 1061–62 (6th Cir.1983). An indictment that tracks the statutory language defining an offense is usually sufficient. *United States v. American West Fibers Company*, 809 F.2d 1044, 1046 (4th Cir.1987).

Here, the language used in Counts 6 and 7 of the Superseding Indictment sufficiently tracks the language of the structuring and money laundering statute. 31 U.S.C. § 5324. If Harada wishes to dispute the facts alleged in those counts of the Superseding Indictment, he will have to wait until trial to do so.

Therefore, Harada's Motion to Dismiss Counts 6 and 7 must be denied.

### F. Motion to Dismiss for Failure to Allege Specific Intent

Harada argues that Counts 1, 6 and 7 fail because they fail to allege the required specific intent for the crimes charged.[7] The cited Counts charge violations of 31 U.S.C. § 5324(1) and (3), which state that no person shall, for the purpose of evading reporting requirements, "structure" a transaction with a financial institution. Harada points out that typically defendants charged with this offense are also "charged" with § 5322, which provides that "willfully violating" any provision of the subchapter (including § 5324) shall be fined and/or imprisoned for a specified period. The Superseding Indictment in this case does not reference § 5322.

Harada argues that because the Superseding Indictment *should* have included § 5322, and because § 5322 applies to "willful" violations, the Superseding Indictment

---

**6.** Of course, this motion is moot as to Count 1, which is dismissed.

**7.** Again, Count 1 is dismissed on other grounds, and this motion is considered only as it applies to Counts 6 and 7.

should have specifically charged a "willful violation." In fact, the Superseding Indictment in Count 1 charges that defendants acted *"willfully* and unlawfully." (Emphasis added.) Counts 6 and 7 allege that they acted "unlawfully, knowingly and *willfully.*" (Emphasis added.) Thus, there does not appear to be a problem; the "willfulness" required by § 5322 (even if it is necessary to bring the Superseding Indictment explicitly under that section) is plainly charged in each count.

▮▮▮ Harada's argument is apparently that the Superseding Indictment is too broad because it charged not just "willful" violation, but also "unlawful" and "knowing" violation. He cites *United States v. 316 Units of Municipal Securities,* 725 F.Supp. 172, 178 (S.D.N.Y.1989) for the proposition that the "villful [sic] violation" element is what distinguishes a criminal action under § 5324 (and, necessarily, § 5322) from a civil forfeiture action. That case dealt with the *absence* of the willfulness element, however. Here, willfulness is charged.

The fact that the charge also described defendants' actions as "knowing" and "unlawful" cannot render charge deficient. The American Law Institute definition of the word "willful" as it appears in the *Model Penal Code* § 2.02(8) provides:

> A requirement that an offense be committed willfully is satisfied if a person acts *knowingly* with respect to the material elements of the offense, unless a purpose to impose further requirements appears.

(Emphasis added.) This definition of "willful" has been applied by the Ninth Circuit in interpreting this very statute: 31 U.S.C. § 5324(3). *United States v. Hoyland,* 914 F.2d 1125, 1129 (9th Cir.1990). Thus acting "willfully" *is* acting "knowingly." There is no inconsistency: the term "knowingly" in the Superseding Indictment is surplusage. As for the addition of the term "unlawfully," Harada can hardly complain that the Superseding Indictment was invalid because it charged him with "unlawful" activity. That is precisely and definitionally what an indictment is.

The Motion to Dismiss for Failure to Allege Specific intent, therefore, must be denied.

### G. Motion to Strike Paragraphs 5, 10 and 16

In this motion, defendant Harada moves this court for an order striking paragraphs 5, 10 and 16 of the "Overt Acts" section of the Superseding Indictment on the grounds that said paragraphs fail to allege acts that could have furthered the conspiracy alleged in Count 1. Because Count 1 is dismissed, this issue is moot.

### IV. *Conclusion*

Count 1 of the Indictment is duplicitous and must be dismissed. Count 5 fails to allege a crime within the meaning of the statute and must also be dismissed. Defendants have failed to allege sufficient grounds for the production of grand jury proceedings, and their motion for the same must be denied. Because Count 5 is dismissed, the motion to sever that Count is moot and the motion to sever Harada's trial lacks any basis. The former may be disregarded but the latter must be denied. The motion to dismiss Counts 1, 6 and 7 depends on issues of fact that must await trial, and therefore must be denied. There is no deficiency in the Indictment's allegations of specific intent, so that motion to dismiss must also be denied. Finally, the motion to strike paragraphs of the indictment is rendered moot by the dismissal of Count 1, and need not be addressed.

IT IS SO ORDERED.